**Phillip W. STANFIELD,**
**Plaintiff–Appellant,**

v.

**OSBORNE INDUSTRIES, INC., Stanley**
**M. Thibault, Ronald Thibault,**
**Defendants–Appellees.**

No. 94–3020.

United States Court of Appeals,
Tenth Circuit.

April 11, 1995.

Dorsey L. Baker, Lubbock, TX (Don W. Noah, Noah & Harrison, P.A., Beloit, Kansas, with him on the briefs), for appellant.

James D. Oliver (John J. Murphy, with him on the briefs), Foulston & Siefkin, Wichita, KS, for appellees.

Before ANDERSON and TACHA, Circuit Judges, and CAMPOS,* Senior District Judge.

TACHA, Circuit Judge.

Plaintiff Phillip W. Stanfield brought this action against defendants Osborne Industries, Inc. (OII), Stanley M. Thibault, and Ronald M. Thibault alleging two claims under the Lanham Act, 15 U.S.C §§ 1051–1128, and various state common law claims. Plaintiff's claims arise from OII's use of two trademarks containing the word "Stanfield." The district court granted defendants' motion for summary judgment as to the Lanham Act claims and declined to exercise supplemental jurisdiction over the remaining state law claims. *Stanfield v. Osborne Indus., Inc.,* 839 F.Supp. 1499, 1508 (D.Kan.1993). Plaintiff appeals the district court's order to this court. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I. Background

In 1972, plaintiff developed several agricultural products including a fiberglass heating pad for newborn hogs.[1] He presented these ideas in a letter to the president of First State Bank in Osborne, Kansas. Although plaintiff was not in the business of manufacturing these products at the time of his letter, he indicated that he would call his business "Stanfield Products" if he went into business. Osborne community leaders subsequently created defendant OII to manufacture plaintiff's products. OII was incorporated in May 1973.

The organizers of OII approached defendant Stanley M. Thibault in March 1973

---

* The Honorable Santiago E. Campos, Senior District Judge, United States District Court for the District of New Mexico, sitting by designation.

1. We have summarized the factual background of the parties' dispute in this opinion. For a more complete explication of the facts, see *Stanfield,* 839 F.Supp. at 1501–03, or *Stanfield v. Osborne Indus., Inc.,* 7 Kan.App.2d 416, 643 P.2d 1115, 1118–20 (1982).

about becoming involved with OII. Stanley Thibault moved to Osborne in September 1973 to become president of OII. In that same month, plaintiff agreed to allow OII to manufacture the products he had developed in exchange for royalties on sales (the 1973 agreement). Plaintiff simultaneously became an employee of OII.

In April 1974, defendant Ronald Thibault, Stanley's brother, undertook several special design projects for OII. Ronald became a full-time employee of OII in April 1975 when he took the position of vice president in charge of marketing and engineering. Ronald decided that OII needed to reduce its dependence on the company that distributed OII's products and develop its own markets. He concluded that OII would need its own trademark to foster its independence. When plaintiff learned of OII's plan to develop a trademark, he insisted that OII use the word "Stanfield" in its mark. OII agreed, and the parties entered into the following agreement (the 1975 agreement):

### LICENSE AGREEMENT

THIS AGREEMENT, made and entered into as of this 5th day of July, 1975, by and between Phillip W. Stanfield, of the County of Osborne, State of Kansas, hereinafter referred to as First Party, and Osborne Industries, Inc., hereinafter referred to as Second Party:

WITNESSETH THAT:

WHEREAS, Second Party is manufacturing certain products of which First Party is the inventor as enumerated in a certain License Agreement by and between said parties dated the 3rd day of October, 1973, and

WHEREAS, Second Party is manufacturing certain products other than invented by First Party, and

WHEREAS, Second Party desires to use the name "Stanfield" on all or part of the products manufactured by Second Party whether or not the same be invented by First Party, as a distinctive mark on said products in conjunction with the name of said products, and

WHEREAS, Second Party desires to use the name "Stanfield" as a distinctive mark on all or part of its products manufactured, at its discretion for a period of Fifteen (15) years from the date of this agreement and that said design of the distinctive mark bearing the name "Stanfield" shall be at the sole discretion of said party of the Second Part as to the design of the same, and

WHEREAS, both parties agree that all products manufactured by Second Party shall bear a distinctive mark and shall bear all marks required by the patent laws pertaining to and in conjunction with a License Agreement between the parties entered into on the 3rd day of October, 1973, and in the event that any of those distinctive marks referring specifically to "Stanfield" products or used in connection with "Stanfield" products shall be registered as a trademark, Second Party will be entitled to use said trademark in connection with the License Agreement dated the 3rd day of October, 1973 by and between the parties and shall use said mark in accordance with the trademark laws.

WHEREAS, in consideration of the use of the name "Stanfield" as above described in this Agreement in regard to any or all products manufactured by Second Party, the sum of $75.00 shall be paid to First Party by Second Party for the use of said name as above described.

This Agreement shall inure to the benefit of and be binding upon the Parties hereto, their respective heirs, legal representatives, successors and assigns.

IN WITNESS WHEREOF, the parties have hereunto executed this Agreement as of the day and year first above written.

OII commissioned an artist to design two trademarks. One mark consisted of the word "Stanfield"; the other mark was a circle design incorporating the word "Stanfield." By September 1976 OII was using both trademarks. OII applied for registration of these trademarks in March 1977. The United States Patent and Trademark Office registered the circle design mark on the principal register of trademarks on January 24, 1978.

Meanwhile, plaintiff had become ill and grown disenchanted with OII. He resigned from OII on September 23, 1975. Since his resignation, plaintiff has had no involvement with OII. In February 1976, the Patent and Trademark Office rejected plaintiff's application for a patent on the hog heating pad. OII stopped paying royalties to plaintiff on the sale of heating pads in December 1976.

Plaintiff filed his first lawsuit against OII in Kansas state court in February 1977, claiming that OII had breached the 1973 agreement by discontinuing the payment of royalties. In that lawsuit, plaintiff alleged that OII's use of the word "Stanfield" was conditioned upon the payment of royalties. Although the jury returned a verdict in plaintiff's favor, the Kansas Supreme Court ultimately overturned that verdict. *Stanfield v. Osborne Indus. Inc.,* 232 Kan. 197, 654 P.2d 917 (1982). The court held that, under the terms of the parties' contract, OII was not obligated to pay royalties to plaintiff after the Patent and Trademark Office denied plaintiff's patent application. *Id.* 654 P.2d at 922.

In connection with the state court case, defendant informed plaintiff that OII considered the July 1975 agreement a release of plaintiff's rights in the word "Stanfield," and that OII had registered its "Stanfield" trademark. OII has continuously used its trademarks in commerce since 1976. In 1983, OII filed declarations with the Patent and Trademark Office to obtain incontestability status.

In September 1991, plaintiff requested that OII discontinue use of the Stanfield trademark, basing his request on his understanding that the 1975 license agreement had expired. OII continued using the trademark, and plaintiff filed this action alleging (1) that defendant's use of the Stanfield trademark violated 15 U.S.C. § 1125, (2) that defendant fraudulently procured the registration of the trademark, and (3) that defendants were liable to plaintiff under several state law theories.

## II. Discussion

### A. Standard of Review

"We review the grant of summary judgment de novo, using the same standard applied by the district court." *Universal Money Ctrs. v. AT & T,* 22 F.3d 1527, 1529 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994). Summary judgment should be granted by the district court "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The initial burden is on the moving party to show "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. The moving party may meet this burden by identifying "those portions of the record which demonstrate the absence of a genuine issue of material fact." *Manders v. Oklahoma ex rel Dept. of Mental Health,* 875 F.2d 263, 265 (10th Cir.1989). The burden then shifts to the nonmoving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed. R.Civ.P. 56(e)). The party resisting summary judgment "may not rest upon the mere allegations or denials of his pleading." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (internal quotation marks omitted). The nonmoving party must, instead, "set forth specific facts showing that there is a genuine issue for trial as to those dispositive

matters for which it carries the burden of proof." *Applied Genetics,* 912 F.2d at 1241.

## B. The 1975 Agreement

As a preliminary matter, we must determine the nature of the parties' 1975 agreement, which is at the core of their dispute. Plaintiff contends that the 1975 agreement was a limited license permitting OII to use the "Stanfield" marks for fifteen years. Defendants argue, and the district court agreed, that the 1975 agreement was a naked license, meaning that plaintiff abandoned any rights in the trademark.

■ Naked (or uncontrolled) licensing of a mark occurs when a licensor allows a licensee to use the mark on any quality or type of good the licensee chooses. 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18.15, at 69 (3d ed. 1992) [hereinafter *McCarthy on Trademarks*]. Such uncontrolled licensing can cause the mark to lose its significance. *Id.* When "a trademark owner engages in naked licensing, without any control over the quality of goods produced by the licensee, such a practice is inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." *First Interstate Bancorp v. Stenquist,* 16 U.S.P.Q.2d (BNA) 1704, 1706, 1990 WL 300321 (N.D.Cal. July 13, 1990). Thus, the licensor must "take some reasonable steps to prevent misuses of his trademark in the hands of others." *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 367 (2d Cir.1959). "The critical question ... is whether the plaintiff sufficiently policed and inspected its licensee['s] operations to guarantee the quality of the

products [the licensee] sold." *Id.* Because a finding of insufficient control results in the forfeiture of a mark,[2] a party asserting insufficient control by a licensor must meet a high burden of proof. *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1017 (9th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).

■ We first review the agreement between the parties for evidence of control. *See Dawn Donut,* 267 F.2d at 368. The 1975 agreement did not give plaintiff an express contractual right to inspect or supervise OII's operations in any way. OII had the right to use the "Stanfield" marks on any of the products it manufactured, including products not developed by plaintiff.[3] Moreover, OII had the "sole discretion" to design the mark. The agreement, then, did not contemplate that plaintiff would have any control of OII's use of the "Stanfield" marks.

■ The absence of an express contractual right of control does not necessarily result in abandonment of a mark, as long as the licensor in fact exercised sufficient control over its licensee. *Id.; see also First Interstate Bancorp,* 16 U.S.P.Q.2d (BNA) at 1705–06. In the instant case, it is undisputed that plaintiff had no contact whatsoever with OII after his employment terminated. Plaintiff contends that he exercised control over OII's use of the "Stanfield" marks by examining one swine heating pad produced by OII,[4] by looking at several pet pads, and by occasionally reviewing OII's promotional materials and advertising. He also contends that his lack of knowledge of any quality control problems is evidence of his control. None of

---

**2.** The parties dispute whether plaintiff ever had any rights in the "Stanfield" trademark. Because this case is an appeal from summary judgment, we accept plaintiff's contention that he had rights in the mark.

**3.** The agreement states that OII "desires to use the name 'Stanfield' as a distinctive mark on all or part of its products manufactured, at its discretion for a period of Fifteen (15) years." The fifteen year limitation supports plaintiff's contention that the agreement was meant to be a limited license; however, as we explain *infra,* all other aspects of the agreement indicate that the agreement was a naked license.

**4.** The district court noted that plaintiff stated in a deposition that he examined one swine heating pad sent to him by his son. *Stanfield,* 839 F.Supp. at 1505 n. 2. Plaintiff subsequently filed an affidavit contending that he examined additional pads "from time to time." We agree with the district court that plaintiff cannot create a genuine issue of material fact by contradicting his earlier statement. *See Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 237 (7th Cir.1991) ("[A] genuine issue of material fact cannot be established by a party contradicting his own earlier statements unless there is a plausible explanation for the incongruity.")

this, however, is evidence that plaintiff actually exercised control *over* OII.

Plaintiff next maintains that he relied on OII for quality control and argues that his reliance on the licensee's quality control is sufficient for him to avoid a finding of a naked license. We disagree.

In cases in which courts have found that a licensor justifiably relied on a licensee for quality control, some special relationship existed between the parties. *See, e.g., Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1121 (5th Cir.1991), *aff'd on other grounds,* — U.S. —, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Transgo,* 768 F.2d at 1017–18; *Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.,* 330 F.2d 667, 670 (7th Cir.1964). In *Taco Cabana,* the court examined a cross-license between two brothers who had run a chain of restaurants together for a number of years. When the brothers decided to divide the business, they agreed that both would continue to use the same trade dress in their respective restaurants. Because the parties had maintained a close, long-term working relationship, the court held that they could justifiably rely on each other to maintain quality. *Taco Cabana,* 932 F.2d at 1121. In *Transgo,* the licensor itself manufactured at least ninety percent of the goods sold by its licensee, utilizing its own procedures to maintain quality. 768 F.2d at 1017. And in *Land O'Lakes,* the court found that the licensor reasonably relied on the licensee to maintain quality because the parties had maintained a successful association with no consumer complaints for over forty years. 330 F.2d at 670.

In contrast, the relationship between plaintiff and defendant here was neither close nor successful. Since 1975, the parties have had no contact with each other except as adversaries in litigation. Under these circumstances, plaintiff could not rely on OII's quality control as a substitute for his own control as a licensor.

Finally, plaintiff argues that defendants are barred from challenging the validity of the license by the equitable doctrine of licensee estoppel. Plaintiff did not, however, present this argument to the district court. "As a general rule we refuse to consider arguments raised for the first time on appeal unless sovereign immunity or jurisdiction is in question." *Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1539 (10th Cir.1992). Because neither sovereign immunity nor jurisdiction is implicated by plaintiff's licensee estoppel argument, we will not consider the argument here.

The terms of the parties' agreement, and their subsequent actions, compel us to hold that the 1975 agreement between plaintiff and OII was a naked license, by which plaintiff abandoned all his rights in the "Stanfield" marks. Having so held, we now turn to plaintiff's claims.

### C. The Section 1125(a) Claims

Plaintiff first claims that defendants violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[5] which prohibits the false designation of origin of a product and the false description of a product. Because plaintiff abandoned his rights in the "Stanfield" marks in the 1975 agreement, we must address whether plaintiff alleges an injury sufficient to confer standing to bring a claim under section 1125(a). "The issue of standing is jurisdictional in nature. Whether or not raised by the parties, we are obligated to

---

**5.** The subsection in effect at the time plaintiff filed suit is set out here in full:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a) (amended 1992). Congress amended § 1125(a) on October 27, 1992. The amended language would not affect the outcome of this case.

satisfy ourselves as to our own jurisdiction at every stage of the proceeding." *Alexander v. Anheuser–Busch Cos.*, 990 F.2d 536, 538 (10th Cir.1993) (citations omitted).

■ There are two distinct bases of liability under section 1125: (1) false representation in advertising concerning the qualities of goods (false advertising claims); and (2) false representations concerning the origin or endorsement of goods (false association or product infringement claims). *Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1108 (9th Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1047, 122 L.Ed.2d 355 (1993); *see also Resource Developers, Inc. v. Statute of Liberty–Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir.1991). Plaintiff apparently claims that defendant is liable under both prongs of section 1125.

■ Under either prong of section 1125, the plaintiff need not be the owner of a registered trademark in order to have standing to sue. *Brunswick Corp. v. Spirit Reel Co.*, 832 F.2d 513, 517 (10th Cir.1987) (stating that plaintiff need not have a federally registered trademark to bring a false designation of origin claim); *DEP Corp. v. Interstate Cigar Co.*, 622 F.2d 621, 624 n. 3 (2d Cir. 1980) (contrasting a section 1125(a) action with a suit brought under section 1114(1), which limits standing to registrants of trademarks); *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 160 (1st Cir.1977) (stating that a party may have standing to sue for false advertising "regardless of whether he is the registrant of a trademark"). Nevertheless, "standing to bring a section [1125(a) ] claim requires the potential for a commercial or competitive injury." *Berni v. International Gourmet Restaurants of Am., Inc.*, 838 F.2d 642, 648 (2d Cir.1988). Because the standing requirements for the two causes of action differ, we discuss them separately.

■ A false advertising claim implicates the Lanham Act's purpose of preventing unfair competition. *See* 15 U.S.C. § 1127. Thus, to have standing for a false advertising claim, the plaintiff must be a competitor of the defendant and allege a competitive injury. *Waits*, 978 F.2d at 1109. In the instant case, plaintiff is not now, nor has he ever been, in competition with defendants. Plaintiff developed the swine heating pad that OII was formed to manufacture. Except for a few samples, plaintiff did not produce the pads for sale. Plaintiff states that he has since developed a modified heating pad that another manufacturer is interested in producing. He concedes, however, that this manufacturer's interest in his new heating pad is in no way dependent on the availability of a "Stanfield" trademark. Because he does not allege a competitive injury, plaintiff lacks standing to bring a false advertising claim.

■ In contrast to a false advertising claim, a false association claim does not require an allegation of competitive injury. *Waits*, 978 F.2d at 1109. A plaintiff must, however, have a reasonable interest to be protected in order to have standing to sue. *Dovenmuehle v. Gilldorn Mortgage Midwest Corp.*, 871 F.2d 697, 700 (7th Cir.1989). "Those with standing to bring [a false association] claim include parties with a commercial interest in the product wrongfully identified with another's mark, ... or with a commercial interest in the misused mark." *Waits*, 978 F.2d at 1109.

■ Here, plaintiff argues that he has a commercial interest in the mark allegedly misused by OII. But he abandoned any rights he may have had in the trademark under the 1975 agreement with OII. *See Georgia Carpet Sales, Inc. v. SLS Corp.*, 789 F.Supp. 244, 246 (N.D.Ill.1992) ("[A]ny claim under Section 1125(a) for the asserted infringement of any trade name that has been the subject matter of a naked license" is "doom[ed].") Although plaintiff asserts that he has plans to compete with OII and would like to use his name in a trademark, the mere potential of commercial interest in one's family name is insufficient to confer standing. *See Dovenmuehle*, 871 F.2d at 700. Thus, he has no reasonable interest to be protected under the Lanham Act. Without a protectible interest, plaintiff lacks standing to bring this claim under section 1125. *See id.* at 701.

*D. Fraudulent Registration*

■ In Count II of his complaint, plaintiff alleges that defendants fraudulently procured registration of the trademarks in violation of 15 U.S.C. § 1120. To prove a claim of fraud in the procurement of a federal trademark, plaintiff must prove:

> (1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false (scienter); (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from such reliance.

*San Juan Prods., Inc. v. San Juan Pools,* 849 F.2d 468, 473 (10th Cir.1988).

Plaintiff's inability to prove the second element is dispositive of the claim. A trademark applicant signs an oath declaring "that no other person, firm, corporation, or association, to the best of [the applicant's] knowledge and belief, has the right to use such mark in commerce." 15 U.S.C. § 1051. It is, therefore, the applicant's subjective belief that is at issue. *San Juan Prods.,* 849 F.2d at 472. "[T]he burden of proving fraudulent procurement of a registration is heavy. Any deliberate attempt to mislead the Patent Office must be established by clear and convincing evidence." *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 942 (10th Cir.1983) (citation omitted). Thus, plaintiff has the burden of proving by clear and convincing evidence that defendant Stanley Thibault signed the oath knowing that it was false; " '[t]here is no room for speculation, inference or surmise, and obviously, any doubt must be resolved against the charging party.' " *Oreck Corp. v. Thomson Consumer Elecs., Inc.,* 796 F.Supp. 1152, 1159–60 (S.D.Ind.1992) (quoting *Citibank N.A. v. Citibanc Group, Inc.,* 215 U.S.P.Q. (BNA) 884, 902, 1982 WL 52144 (N.D.Ala. Mar. 24, 1982)).

Plaintiff produced no evidence that defendant knew the oath was false. Affidavits from both Stanley and Ronald Thibault indicate that Stanley Thibault believed that OII had the right to register the trademarks and that plaintiff had assigned any rights in the marks to OII in the 1975 agreement. Plaintiff argues that the 1975 agreement itself is evidence that defendant signed the oath knowing it was false. But our discussion of the agreement shows that Stanley Thibault could have reasonably believed that plaintiff waived his rights to the trademark in that agreement. With no other evidence to contradict defendants' statements, plaintiff has failed "to establish the existence of an element essential to [his] case." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

### III. Conclusion

For the reasons stated herein, the order of the district court granting defendants summary judgment is **AFFIRMED.**