**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FREECYCLESUNNYVALE, a California
unincorporated association,
*Plaintiff-counter-defendant-*
*Appellee,*

v.

THE FREECYCLE NETWORK,
*Defendant-counter-claimant-*
*Appellant.*

No. 08-16382

D.C. No.
4:06-cv-00324-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia A. Wilken, District Judge, Presiding

Argued and Submitted
August 10, 2010—San Francisco, California

Filed November 24, 2010

Before: Susan P. Graber, Consuelo M. Callahan, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Callahan

18807

---

**COUNSEL**

Eric B. Evans (argued), Ian N. Feinberg, Donald M. Falk, John J. Fitzgerald IV of Mayer Brown LLP, for plaintiff-counter-defendant-appellee FreecycleSunnvale.

Lisa Kobialka (argued), Paul D. Clement, Paul Andre, Meghan Ashley Wharton, and Amy Sun of King & Spalding LLP, for defendant-counter-claimant-appellant The Freecycle Network.

**OPINION**

CALLAHAN, Circuit Judge:

FreecycleSunnyvale ("FS") is a member group of The Free-cycle Network ("TFN"), an organization devoted to facilitating the recycling of goods. FS filed a declaratory action against TFN arising from a trademark licensing dispute, alleging noninfringement of TFN's trademarks and tortious interference with FS's business relations. FS moved for partial summary judgment on the issue of whether its naked licensing defense to trademark infringement allowed it to avoid a finding of infringement as a matter of law.[1] TFN argued that it had established adequate quality control standards over its licensees' services and use of the trademarks to avoid a finding of naked licensing and abandonment of its trademarks. The district court granted summary judgment to FS. We hold that TFN (1) did not retain express contractual control over FS's quality control measures, (2) did not have actual controls over FS's quality control measures, and (3) was unreasonable in relying on FS's quality control measures. Because we find that TFN engaged in naked licensing and thereby abandoned its trademarks, we affirm.

---

[1]Naked licensing occurs when a licensor does not exercise adequate quality control over its licensee's use of a licensed trademark such that the trademark may no longer represent the quality of the product or service the consumer has come to expect. *See Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 595-96 (9th Cir. 2002). By not enforcing the terms of the trademark's use, the licensor may forfeit his rights to enforce the exclusive nature of the trademark. The key question is therefore whether TFN produced any evidence to raise a material fact issue as to whether it: (1) retained contractual rights to control the quality of the use of its trademark; (2) actually controlled the quality of the trademark's use; or (3) reasonably relied on FS to maintain the quality. *Barcamerica*, 289 F.3d at 596-98 (upholding trademarks where a licensor is familiar with the licensee and reasonably relies on the licensee's own quality control efforts).

# I

## A

In March 2003, Deron Beal ("Beal") founded TFN, an umbrella non-profit Arizona corporation dedicated to "free-cycling." The term "freecycling" combines the words "free" and "recycling" and refers to the practice of giving an unwanted item to a stranger so that it can continue to be used for its intended purpose, rather than disposing of it.[2] As practiced by TFN, freecycling is primarily a local activity conducted by means of internet groups, which are created by volunteers through online service providers like Yahoo! Groups and Google Groups.[3] Although not required to do so, most TFN member groups use Yahoo! Groups as a forum for members to coordinate their freecycling activities. TFN also maintains its own website, www.freecycle.org, which provides a directory of member groups as well as resources for volunteers to create new groups. The website also includes a section devoted to etiquette guidelines.

TFN asserts that it maintains a "Freecycle Ethos"—a democratic leadership structure, in which decisions are made through a process of surveys and discussions among volunteer moderators. Local volunteer moderators are responsible for enforcing TFN's rules and policies, but the moderators have flexibility in enforcement depending on the moderators' assessment of their local communities.

---

[2]Beal did not coin the word "freecycle" and TFN is not the first organization to promote freecycling.

[3]In general, online discussion groups such as Yahoo! Groups and Google Groups allow individuals with a shared common interest to communicate by means of posting messages to the particular group's online forum. Such groups may be subject to terms and conditions of the service provider. In addition, discussion groups often have volunteer group moderators who monitor the discussions, and each group may adopt and enforce rules and regulations (e.g., discussion etiquette) separate from whatever terms the online service provider imposes.

Since May 2003, TFN has been using three trademarks, FREECYCLE, THE FREECYCLE NETWORK, and a logo (collectively "the trademarks") to identify TFN's services and to identify member groups' affiliation with TFN. Federal registration of the trademarks is currently pending in the United States, but the trademarks have been registered in other countries. TFN permits member groups to use the trademarks. When TFN first started, Beal personally regulated the use of the trademarks but, as TFN has grown, it has relied on local moderators to regulate member groups' use of the trademarks.

Lisanne Abraham ("Abraham") founded FS on October 7, 2003, in Sunnyvale, California, without TFN's knowledge or involvement. She established the group by entering into a service contract with Yahoo! Groups and becoming the group's moderator. Upon establishing FS, Abraham adapted etiquette guidelines and instructions for how to use FS from either TFN's or one of TFN's member group's website. On October 7, 2003, Abraham emailed Beal directly asking for a logo for FS, and they spoke over the phone within days of the email communication. After the phone conversation, Beal emailed Abraham on October 9, 2003, stating: "You can get the neutral logo from www.freecycle.org, just don't use it for commercial purposes or you [sic] maybe Mark or Albert can help you to do your own fancy schmancy logo!"[4] This email is the only record of a direct communication between FS and TFN regarding the use of any of the trademarks.

Between October 7, 2003, and October 9, 2003, FS was added to TFN's list of online freecycling groups displayed on TFN's website. Then, on October 9, 2003, Abraham received an email from Beal addressed to nineteen moderators of new freecycle Yahoo! Groups which, among other things, welcomed them to TFN. The email did not discuss or include any

---

[4]Mark Messinger is the moderator for the Olympia, Washington, freecycle group. He helped Abraham fashion a unique freecycle logo for Sunnyvale. Albert Kaufman apparently introduced Abraham to freecycling.

restrictions or guidance on the use of TFN's trademarks. On October 13, 2003, Abraham received another email from TFN, this time an invitation to join the "freecyclemodsquad" Yahoo! Group ("modsquad group"), an informal discussion forum exclusively for the moderators of freecycle Yahoo! Groups to share ideas.

Before 2004, TFN had only a few suggested guidelines in the etiquette section of its website, including a "Keep it Free" rule. Then, on January 4, 2004, Beal sent an email to the modsquad group, asking whether TFN should also limit listed items to those that were legal. Ultimately, Beal proposed the adoption of a "Keep it Free, Legal & Appropriate for All Ages" rule and asked "that all moderators vote on whether they feel this is the one rule that should apply to ALL local groups or not." Between January 4 and January 11, 2004, a majority of the modsquad group voted to require all local groups to adopt the rule and, on January 11, Beal informed the group that "I'm glad to say . . . we now have one true guiding principle." Although the moderators adopted the "Keep it Free, Legal & Appropriate for All Ages" rule, following its adoption, they frequently discussed what the actual meaning of the rule was and, ultimately, its definition and enforcement varied from group to group.

Although the underlying reason is not evident from the record or the parties' briefs, on November 1 and November 14, 2005, TFN sent emails to FS ordering the group to cease and desist using the Freecycle name and logo and threatening to have Yahoo! terminate FS's Yahoo! Group if FS did not comply. On November 5, FS emailed Yahoo! and disputed TFN's ability to forbid the use of the trademarks by informing Yahoo! of the license that TFN allegedly had granted FS in October 2003 (i.e., Beal's October 9, 2003 email authorizing Abraham to use the logo). On November 21, Yahoo! terminated the FS Yahoo! Group at TFN's request, after receiving a claim from TFN that FS was infringing on TFN's trademark rights.

## B

On January 18, 2006, FS filed a declaratory judgment action against TFN in the U.S. District Court for the Northern District of California, alleging noninfringement of TFN's trademarks and tortious interference with FS's business relations. TFN brought counterclaims for trademark infringement and unfair competition under the Lanham Act and California Business and Professions Code section 17200.

FS then moved for summary judgment on the issue of whether its naked licensing defense to trademark infringement allowed it to avoid a finding of infringement as a matter of law. FS argued that TFN had abandoned its trademarks because it engaged in naked licensing when it granted FS the right to use the trademarks without either (1) the right to control or (2) the exercise of actual control over FS's activities. On March 13, 2008, the district court granted summary judgment in favor of FS, holding that TFN engaged in naked licensing and therefore abandoned its rights to the trademarks. The parties stipulated to dismiss the remaining claims, and final judgment was entered on May 20, 2008. TFN thereafter timely filed its appeal.

## II

We review de novo a grant of partial summary judgment. *Lawrence v. Dep't of Interior*, 525 F.3d 916, 920 (9th Cir.), cert denied, 129 S. Ct. 305 (2008). "The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact." *Balint v. Carson City*, 180 F.3d 1047, 1050 (9th. Cir. 1999) (citation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, our inquiry "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Id.* at 252. We have held that the proponent of a naked license theory of trademark abandonment must meet a "stringent standard of proof." *Barcamerica*, 289 F.3d at 596 (internal quotation marks omitted); *see also Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.2d 1150, 1156 (9th Cir. 1982) ("Abandonment of a trademark, being in the nature of forfeiture, must be strictly proved."); *Edwin K. Williams & Co. v. Edwin K. Williams & Co.- E.*, 542 F.2d 1053, 1059 (9th. Cir. 1976) ("[A] person who asserts insufficient control [of a trademark] must meet a high burden of proof.").

We have yet to determine, however, whether this high standard of proof requires "clear and convincing" evidence or a "preponderance of the evidence." *See Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 935 n.2 (9th Cir. 2006) (reserving the issue of the standard of proof to show trademark abandonment, but noting that at least one district court in the Ninth Circuit had required "clear and convincing" evidence). Indeed, in *Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 952-54 (9th Cir. 2007) (per curiam), Judges Wallace and McKeown disagreed in separate concurrences as to which standard applies. Judge Wallace advocated the clear and convincing standard, while Judge McKeown argued that the preponderance of the evidence standard applied. *Id.*

A review of our sister circuits' decisions reveals that only two circuits have considered which standard to apply, with one reserving the issue and the other adopting a preponderance of the evidence standard. *See Cumulus Media, Inc. v. Clear Channel Commcn's, Inc.*, 304 F.3d 1167, 1175 n.12 (11th Cir. 2002) (declining to address the meaning of "strict burden" because the outcome of the case would be the same with either standard of proof); *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1024 (Fed. Cir.

1989) (adopting the preponderance of the evidence standard). Most published lower court decisions that have reached this issue appear to have interpreted the "strictly proven" standard to require "clear and convincing" evidence of naked licensing. *See* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17:12 n.2 (4th ed. 2010).[5]

Here, we need not decide which standard of proof applies because, even applying the higher standard of proof—clear and convincing—and viewing the evidence in the light most favorable to TFN as the non-moving party, FS has demonstrated that TFN engaged in naked licensing and consequently abandoned the trademarks.

## III

An introduction to "naked licensing" of trademarks is in order, as this issue has seldom arisen in this circuit or in our sister circuits. Our only discussion of this subject is in *Barcamerica*, 289 F.3d at 598 (holding that Barcamerica, a vintner, engaged in naked licensing and abandoned its trademark by failing to retain or otherwise exercise adequate quality control over the trademark it had licensed to another company), and that decision informs and guides our discussion here.

---

[5]Citing, *inter alia*, *Mathy v. Republic Metalware Co.*, 35 App. D.C. 151, 1910 WL 20792 at *3, (1910) ("Abandonment being in the nature of a forfeiture, it is incumbent upon the person alleging it to prove by clear and convincing evidence that the right claimed has been relinquished."); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1355 (E.D.N.Y. 1994) ("[A]n affirmative defense alleging a break in plaintiff's chain of priority under the doctrine of abandonment must be proven by clear and convincing evidence."); *EH Yacht, LLC v. Egg Harbor, LLC*, 84 F. Supp. 2d 556, 564-65 (D.N.J. 2000) (noting that the majority of courts have held that the "strictly proven" standard requires proof by clear and convincing evidence.); *accord Cash Processing Servs. v. Ambient Entm't*, 418 F. Supp. 2d 1227, 1232 (D. Nev. 2006).

**[1]** As a general matter, trademark owners have a duty to control the quality of their trademarks. McCarthy § 18:48. "It is well-established that '[a] trademark owner may grant a license and remain protected provided quality control of the goods and services sold under the trademark by the licensee is maintained.' " *Barcamerica*, 289 F.3d at 595-96 (quoting *Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992)).

**[2]** "Naked licensing" occurs when the licensor "fails to exercise adequate quality control over the licensee." *Id.* at 596. Naked licensing may result in the trademark's ceasing to function as a symbol of quality and a controlled source. *Id.* (citing McCarthy § 18:48). We have previously declared that naked licensing is "*inherently deceptive* and constitutes abandonment of any rights to the trademark by the licensor." *Id.* at 598. "Consequently, where the licensor fails to exercise adequate quality control over the licensee, 'a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark.' " *Id.* at 596 (quoting *Moore*, 960 F.2d at 489).

## A

At issue here is whether there is clear and convincing evidence, viewed in the light most favorable to TFN, that TFN allowed FS to use the trademarks with so few restrictions as to compel a finding that TFN engaged in naked licensing and abandoned the trademarks. TFN contends that disputed issues of material fact remain as to whether TFN's quality control standards, during the relevant time period, were sufficient. Although TFN concedes that it did not have an express license agreement, it alleges that a reasonable jury could find that it had adequate quality control measures in place when FS was authorized to use the trademarks, making summary judgment inappropriate.

## 1

**[3]** When deciding summary judgment on claims of naked licensing, we first determine whether the license contained an express contractual right to inspect and supervise the licensee's operations. *See Barcamerica*, 289 F.3d at 596. The absence of an agreement with provisions restricting or monitoring the quality of goods or services produced under a trademark supports a finding of naked licensing. *Id.* at 597; *see also Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 871 (10th Cir. 1995) (granting summary judgment where license agreement lacked right to inspect or supervise licensee's operations and gave the licensee sole discretion to design the trademark).

**[4]** TFN concedes that it did not have an express license agreement with FS regarding FS's use of the trademarks. Without an express license agreement, TFN necessarily lacks express contractual rights to inspect and supervise FS. However, TFN argues that the October 9, 2003 email, in which Beal advised Abraham that: "You can get the neutral logo from www.freecycle.org, *just don't use it for commercial purposes . . . .*", reflects an implied license. Emphasis added.

**[5]** Even assuming that Beal's emailed admonition to Abraham not to use the trademarks for commercial purposes constitutes an implied licensing agreement, it contained no express contractual right to inspect or supervise FS's services and no ability to terminate FS's license if FS used the trademarks for commercial purposes. *See Barcamerica*, 289 F.3d at 597 (determining that a license agreement lacking similar controls was insufficient). We therefore hold that, by TFN's own admission, there is no disputed issue of material fact as to whether TFN maintained an express contractual right to control quality.

## 2

**[6]** TFN next contends that, despite its lack of an express contractual *right to* control quality, a material issue of fact

remains as to whether TFN maintained *actual* control over its member groups' services and use of the trademarks when FS was granted use of the trademarks in October 2003. "The lack of an express contract right to inspect and supervise a licensee's operations is not conclusive evidence of lack of control." *Barcamerica*, 289 F.3d at 596. However, where courts have excused the lack of a contractual right to control quality, they have still required that the licensor demonstrate *actual* control through inspection or supervision. *See, e.g., Stanfield*, 52 F.3d at 871 ("The absence of an express contractual right of control does not necessarily result in abandonment of a mark, as long as the licensor in fact exercised sufficient control over its licensee.").

TFN asserts that it exercised actual control over the trademarks because it had several quality control standards in place, specifically: (1) the "Keep it Free, Legal, and Appropriate for all Ages" standard and TFN's incorporation of the Yahoo! Groups' service terms; (2) the non-commercial services requirement (expressed in Beal's October 9, 2003 email); (3) the etiquette guidelines listed on TFN's website; and (4) TFN's "Freecycle Ethos" which, TFN contends, establishes policies and procedures for member groups, even if local member groups are permitted flexibility in how to apply those policies and procedures. In addition, TFN cites *Birthright v. Birthright, Inc.*, 827 F. Supp. 1114 (D.N.J. 1993) for the principle that loosely organized non-profits like TFN and FS that share "the common goals of a public service organization" are subject to less stringent quality control requirements.

**[7]** First, we disagree with TFN's contentions that the "Keep it Free, Legal, and Appropriate for all Ages" standard and its incorporation of the Yahoo! Groups' service terms constituted actual controls over its member groups.[6] The

---

[6]Notably, Beal did not propose, and the modsquad did not adopt, this standard until January 2004, more than three months after Abraham

undisputed evidence showed that TFN's licensees were not required to adopt the "Keep it Free, Legal, and Appropriate for all Ages" standard, nor was it uniformly applied or interpreted by the local groups. Similarly, FS was not required to use Yahoo! Groups and was not asked to agree to the Yahoo! Groups' service terms as a condition of using TFN's trademarks. Moreover, the Yahoo! Groups' service terms, which regulate generic online activity like sending spam messages and prohibiting harassment, cannot be considered quality controls over TFN's member groups' services and use of the trademarks. The service terms apply to every Yahoo! Group, and do not control the quality of the freecycling services that TFN's member groups provide. Thus, the "Keep it Free, Legal and Appropriate for All Ages" standard and the Yahoo! Groups' service terms were not quality controls over FS's use of the trademarks.

**[8]** Second, we conclude that TFN's non-commercial requirement says nothing about the *quality* of the services provided by member groups and therefore does not establish a control requiring member groups to maintain consistent quality. Thus, it is not an actual control in the trademark context. Third, because member groups may freely adopt and adapt TFN's listed rules of etiquette and because of the voluntary and amorphous nature of these rules, they cannot be considered an actual control. For example, FS modified the etiquette that was listed on TFN's website and TFN never required FS to conform to TFN's rules of etiquette. Fourth, TFN admits that a central premise of its "Freecycle Ethos" is local enforcement with local variation. By definition, this

founded FS in October 2003. The only standard listed in TFN's etiquette section on its website in 2003 was "Keep it Free," but there was no requirement that member groups adopt this standard. Similarly, TFN's incorporation of the Yahoo! Groups' service terms was not done until after FS was given use of the trademarks in October 2003. Because we hold that TFN did not exercise actual control no matter what time period is considered, we do not address whether actual supervision would be sufficient if it starts at some point after the granting of a license to use a trademark.

standard does not maintain consistency across member groups, so it is not an actual control.

Even assuming that TFN's asserted quality control standards actually relate to the quality of its member groups' services, they were not adequate quality controls because they were not enforced and were not effective in maintaining the consistency of the trademarks. Indeed, TFN's alleged quality controls fall short of the supervision and control deemed inadequate in other cases in which summary judgment on naked licensing has been granted to the licensee. *See, e.g., Barcamerica*, 289 F.3d at 596-97 (finding no express contractual right to inspect and supervise the use of the marks coupled with licensor's infrequent wine tastings and unconfirmed reliance on the winemaker's expertise was inadequate evidence of quality controls to survive summary judgment); *Stanfield*, 52 F.3d at 871 (granting summary judgment to the licensee where the license agreement lacked a right to inspect or supervise licensee's operations, and alleged actual controls were that the licensor examined one swine heating pad, looked at other pet pads, and occasionally reviewed promotional materials and advertising).

**[9]** Moreover, even if we were inclined to accept the premise allegedly set forth in *Birthright*, that loosely organized non-profits that share common goals are subject to less stringent quality control requirements for trademark purposes, the result would be the same. In *Birthright*, the court held that the license was not naked because the licensor "monitored and controlled" its licensees' use of the trademarks. 827 F. Supp. at 1139-40; *see also Barcamerica,* 289 F.3d at 596 (holding that a licensor may overcome the lack of a formal agreement if it exercises actual control over its licensees). Here, TFN exercised no actual control over its licensees, so even under a less stringent standard, TFN has not raised a material issue of fact as to whether it exercised actual control over FS's use of the trademarks. *See Barcamerica*, 289 F.3d at 598.

**3**

**[10]** TFN contends that even if it did not exercise actual control, it justifiably relied on its member groups' quality control measures. Although "courts have upheld licensing agreements where the licensor is familiar with and relies upon the licensee's own efforts to control quality," *Barcamerica*, 289 F.3d at 596 (internal quotation marks and brackets omitted), we, like the other circuits that have considered this issue, have required that the licensor and licensee be involved in a "close working relationship" to establish adequate quality control in the absence of a formal agreement, *id.* at 597; *accord Stanfield*, 52 F.3d at 872; *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991). In *Barcamerica*, we cited four examples of "close working relationships" that would allow the licensor to rely on the licensee's own quality control: (1) a close working relationship for eight years; (2) a licensor who manufactured ninety percent of the components sold by a licensee and with whom it had a ten year association and knew of the licensee's expertise; (3) siblings who were former business partners and enjoyed a seventeen-year business relationship; and (4) a licensor with a close working relationship with the licensee's employees, and the pertinent agreement provided that the license would terminate if certain employees ceased to be affiliated with the licensee. 289 F.3d at 597.

**[11]** Here, TFN and FS did not enjoy the type of close working relationship that would permit TFN to rely on FS's quality control measures. TFN had no long term relationship with Abraham or the FS group. In fact, the October 9, 2003 email between Beal and Abraham, which mentions using the TFN logo, was the parties' first and only written communication about the trademarks prior to TFN's requests to stop using them in November 2006. In addition, TFN had no experience with FS that might have supported its alleged confidence in FS's quality control measures. Thus, even considered in a light most favorable to TFN, no evidence showed the type

of close working relationship necessary to overcome TFN's lack of quality controls over FS. *See id.*

**[12]** Furthermore, we have held that, while reliance on a licensee's own quality control efforts is a relevant factor, such reliance is *not alone sufficient* to show that a naked license has not been granted.[7] *See Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1017-18 (9th Cir. 1985) (noting that, although the licensor had worked closely with the licensee for ten years, the licensor did not rely solely on his confidence in the licensee, but exercised additional control by, *inter alia*, periodically inspecting those goods and was consulted regarding any changes in the product). Because sole reliance on a licensee's own control quality efforts is not enough to overcome a finding of naked licensing without other indicia of control, *see id.* at 1017-18, and because TFN lacked a close working relationship with FS and failed to show any other indicia of actual control, we conclude that TFN could not rely solely on FS's own quality control efforts.

**B**

TFN's three remaining arguments also fail to raise a material issue of fact that precludes a grant summary of judgment for FS. First, TFN asserts that it should be subject to a lesser level of quality control standard because its services are not dangerous to the public and the public expects local variation in services so the probability of deception is low. We have stated that the "standard of quality control and the degree of

---

[7]Other circuits have also relied on the licensor's confidence in the licensee only where there were additional indicia of control. *See, e.g., Stanfield*, 52 F.3d at 872 (holding summary judgment for the licensee appropriate where no special relationship between the parties existed and no evidence of actual control over the licensee existed); *Land O' Lakes Creameries, Inc. v. Oconomowoc Canning Co.*, 330 F.2d 667 (7th Cir. 1964) (upholding trademark where licensor's name appeared on trademark product label, and product was sold under license for forty years without complaints about quality).

necessary inspection and policing by the licensor will vary." *Barcamerica*, 289 F.3d at 598. The licensor need only exercise "control sufficient to meet the reasonable expectations of customers." McCarthy, § 18:55. However, because TFN did not establish *any* quality control requirements for its member groups, we do not need to decide what efforts to oversee a licensee's performance might meet a low standard of quality control.

TFN's remaining two arguments—(1) that FS must show both naked licensing *and* a loss of trademark significance, and (2) that FS is estopped from supporting its naked licensing defense with evidence that demonstrates that TFN did not adequately control the services offered by FS when using the trademarks—are both raised for the first time on appeal, so we decline to reach them. *See United States v. Robertson*, 52 F.3d 789, 791 (9th Cir. 1994) ("Issues not presented to the district court cannot generally be raised for the first time on appeal.").

## IV

**[13]** We determine, viewing the record in the light most favorable to TFN, that TFN (1) did not retain express contractual control over FS's quality control measures, (2) did not have actual control over FS's quality control measures, and (3) was unreasonable in relying on FS's quality control measures. Therefore, we conclude that TFN engaged in naked licensing and consequently abandoned the trademarks. The district court's grant of summary judgment in favor of FS and against TFN is **AFFIRMED.**