HCW Ret. & Fin. Servs., LLC v. HCW Emp. Benefit Servs., LLC, 2015 NCBC 70.

STATE OF NORTH CAROLINA

COUNTY OF ORANGE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
10 CVS 1447

HCW RETIREMENT AND FINANCIAL
SERVICES, LLC, *et al.*,
    Plaintiffs

   v.

HCW EMPLOYEE BENEFIT SERVICES,
LLC, *et al.*,
    Defendants

HCW EMPLOYEE BENEFITS
SERVICES, LLC; and HILL, CHESSON &
WOODY, INC.,
    Counterclaimants

   v.

HCW RETIREMENT AND FINANCIAL
SERVICES, LLC, *et al.*,
    Counterclaim
    Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 2777

WILTON R. DRAKE, III,
    Plaintiff

   v.

PRESCOTT OFFICE MANAGEMENT, LLC,
a North Carolina Limited Liability Company,
TODD T. YATES and FRANK S. WOODY, III,
    Defendants

)
)
)
)
)
)
)
)
)
)

## OPINION AND ORDER

THIS CAUSE, assigned to the undersigned Special Superior Court Judge for Complex

Business Cases, comes before the Court on Defendant HCW Employee Benefit Services LLC

("EBS")'s Motion for Summary Judgment, Defendants Todd Yates and Frank Woody's Motion for Summary Judgment, Defendant Hill, Chesson & Woody, Inc. ("HCWI")'s Motion for Summary Judgment, Defendant Prestwick Six LLC ("Prestwick")'s Motion for Summary Judgment, and Plaintiffs'[1]-Counterclaim Defendants' Motion for Summary Judgment (collectively, "Motions"), pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). On April 16, 2015, the Court held a hearing on the Motions.

THE COURT, after considering the Motions, the briefs in opposition and support thereof, arguments of counsel, and the evidence and other appropriate matters of record, CONCLUDES as stated herein.

*Northen Blue, LLP by J. William Blue, Esq. for Plaintiffs/Counterclaim Defendants.*

*Coats & Bennett PLLC by Anthony J. Biller, Esq. and Emily M. Haas, Esq. and Morris, Manning & Martin, LLP by Keith D. Burns, Esq. for Defendants/Counterclaim Plaintiff.*

McGuire, Judge.

### PROCEDURAL BACKGROUND

1. On August 20, 2010, Plaintiffs initiated *HCW Retirement and Financial Services, LLC v. HCW Employee Benefit Services, LLC* (10 CVS 1447) by filing their Complaint with the Orange County Clerk of Court. On January 26, 2011, Plaintiffs filed a First Amended Complaint ("Amended Complaint") that added as Defendants Hill, Chesson & Woody, Inc., Prestwick Six, LLC, Frank S. Woody III, and Todd T. Yates. The Amended Complaint alleges 17 Claims for Relief ("Claim(s)") against the various Defendants, which Plaintiffs titled as follows:

    a. Violation of Partnership Obligations;

---

[1] As will be discussed below, *HCW Ret. & Fin. Svcs., LLC v. HCW Empl. Benefit Svcs., LLC* and *Drake v. Prescott* have been formally consolidated as one proceeding. The only motions pending before the Court for purposes of this Order are in the *HCW* case. Accordingly, the term "Plaintiffs" refers to the Plaintiffs in *HCW*.

b. Infringement of Trade Name;

c. Claim for Cancellation of N.C. Trademark Registration No. T-020223;

d. Defendant EBS Is Not the Owner of "Experience the Benefit;"

e. Registration of "Experience the Benefit" Was Obtained Fraudulently;

f. Claim for Cancellation of N.C. Trademark Registration No. T-020247;

g. Defendant EBS is Not the Owner of the Logo;

h. Registration of the Logo Was Obtained Fraudulently;

i. Claim for Cancellation of N.C. Trademark Registration No. T-020312;

j. Defendant EBS is Not the Owner of "Hill, Chesson & Woody;"

k. Registration of "Hill, Chesson & Woody" was Obtained Fraudulently;

l. Breach of Good Faith by Defendants Yates and Woody as LLC Members;

m. Breach of Fiduciary Obligation to Minority Member;

n. Accounting;

o. Breach of Lease Agreement;

p. Conversion; and,

q. Interference with Contractual Relationships and Interference with Prospective Advantage.

2. On February 28, 2011, Defendants EBS and HCWI filed a joint Answer to the First Amended Complaint, stating Counterclaims on behalf of EBS against Plaintiffs for the following:

a. Violation of the Lanham Act – 15 U.S.C. § 1125;

b. Violation of the N.C. Trademark Registration Act – N.C. Gen. Stat. § 80-11 & 80-12 and N.C. Unfair and Deceptive Trade Practices Act – N.C. Gen. Stat. § 75-1.1;

c. Declaratory Judgment –N.C. Gen. Stat. § 1-253 & Rule 57; and,

d. Preliminary and Permanent Injunction 15 U.S.C. § 1116; N.C. Gen. Stat. § 1-485 and Rule 65(a).

3. On February 18, 2011, Defendants Yates and Woody filed a joint Answer to Plaintiffs' First Amended Complaint. On March 4, 2011, Defendant Prestwick filed its Answer to the First Amended Complaint.

4. On March 23, 2011, Plaintiffs filed their Reply to the Counterclaims. Plaintiffs asserted several affirmative defenses, including the defense of naked licensing.[2]

5. On April 26, 2013, Plaintiff Drake filed his Complaint in *Drake v. Prescott Office Management, LLC, Todd T. Yates, and Frank S. Woody* (13 CVS 2777) with the Durham County Clerk of Court. The *Drake* Complaint seeks dissolution of Defendant Prescott Office Management.[3] On May 10, 2013, *Drake* was designated to the North Carolina Business Court as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina.

6. On December 3, 2013, *HCW Retirement and Financial Services, LLC v. HCW Employee Benefit Services, LLC* (10 CVS 1447) was designated an exceptional case pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts, by order of the Chief Justice of the Supreme Court of North Carolina.

7. Upon a joint motion of the parties, the Honorable John R. Jolly, Jr. consolidated the two civil cases on April 25, 2014, finding that the cases "involve common questions of law and fact, and are at similar stages procedurally" and ordering that the actions be consolidated into one action for all purposes.[4] Thus, *HCW* and *Drake* have since been treated as one case.

---

[2] Reply at 5.
[3] Prescott Office Management is not a defendant in *HCW*.
[4] Order on Joint Mot. Consolidate.

8. On July 25, 2014, Defendants EBS, Todd Yates, Frank Woody, HCWI, and Prestwick (collectively referred to as "Defendants") filed their Motions for Summary Judgment. Collectively, the Motions seek summary judgment in Defendants' favor as to all claims alleged in the Amended Complaint. The EBS Motion also seeks summary judgment on EBS and HCWI's Counterclaims, including a declaration that EBS and the individuals Hill, Chesson and Woody own superior rights in the disputed trademarks, and on Plaintiffs'-Counterclaim Defendants' affirmative defense of naked licensing. Due to ongoing discovery disputes between the parties, the Court permitted both Plaintiffs and Defendants to file supplemental briefs regarding the Defendants' Motions. Accordingly, Defendants' Motions became ripe for consideration on March 18, 2015.

9. On January 30, 2015, Plaintiffs filed their Motion for Summary Judgment. The Plaintiffs' Motion seeks summary judgment in their favor as to all counterclaims alleged by Defendant HCWI, and EBS' counterclaims for violation of the Lanham Act and violation of the North Carolina Trademark Registration Act. Plaintiffs' Motion became ripe for consideration on March 17, 2015.

10. The parties have not filed motions for summary judgment with regard to any of the claims in the Drake lawsuit.

11. The Motions have been fully briefed and argued and are ripe for determination.

FACTUAL BACKGROUND

12. The dispute pending before the Court stems, in large part, from previous working relationships of businesses operating under variations of the name "Hill, Chesson & Woody," or "HCW."

13. Dan Hill ("Hill") and Earl Chesson ("Chesson"), both non-parties to this lawsuit, began working together in the early 1970s, providing insurance, retirement, and

investment services under the name "Hill, Chesson & Associates."[5] In 1991, Hill and Chesson hired Frank S. Woody ("Woody") as a full time employee. In 2000, Hill and Chesson offered to add Woody's name to the business. The three have since operated under the "Hill, Chesson & Woody" banner, offering various insurance and financial planning services.[6]

    a. *HCW Employee Benefits Service, LLC and HCW Retirement and Financial Services, LLC*

14. In 2002, Woody and Defendant Todd Yates ("Yates") formed Defendant HCW Employee Benefit Services, LLC ("EBS"). EBS provides services and products related to employee group health plans.[7]

15. In the early 2000s, Woody began a referral relationship with Plaintiff Wilton Drake ("Drake"), a financial planner, advisor, and consultant involved in the sale and service of pension and retirement plans, executive benefits and other related services. These services were different than the insurance products and services offered by EBS, and the parties were able to refer clients to one another for the other's services.[8]

16. In 2003, Woody and Yates invited Drake to enter into an office sharing agreement. Drake subsequently formed Plaintiff HCW Retirement and Financial Services, LLC ("RFS") in August 2003.[9] Drake selected the business name to include the HCW brand and parallel the name of EBS with the knowledge and consent of Yates and Woody.[10] Drake

---

[5] Chesson Dep. ¶¶13-16; Hill Dep. ¶12.
[6] Affidavit of Frank S. Woody, III (Oct. 12, 2010) ("2010 Woody Aff.") ¶¶ 3-5, 8; Affidavit of Dan Hill (Sept. 24, 2010) ("2010 Hill Aff.") ¶ 8; Deposition of Frank S. Woody 22.
[7] 2010 Woody Aff. ¶ 10; *see also* Reply Brief Supp. Pls.'-Countercl. Defs.' Mot. Summ. J. Ex. 7 (federal trademark application identifying EBS as a business that provides "[a]dvisory services in the field of employee benefits for group healthcare and business insurance offered to employees in addition to standard benefits such as medical, dental, life insurance including short term disability, long term disability, cancer insurance, accidental death and dismemberment").
[8] 2010 Woody Aff. ¶¶ 15-16.
[9] Affidavit of Wilton R. Drake, III in Opposition to Defendants' Motion for Summary Judgment ("Drake Aff.") ¶ 9. In October 2004, Drake formed Plaintiff Hill, Chesson & Woody Retirement and Financial Services, LLC ("HCWRFS"). *Id.* ¶ 13.
[10] Drake Aff. ¶ 12.

did not have any ownership interest in EBS, and Woody and Yates did not have any ownership in RFS.

17. From 2004 to 2010, EBS and RFS jointly marketed the Hill, Chesson and Woody and HCW brands.[11] At a jointly sponsored business luncheon in October 2004, EBS and RFS announced that RFS had become "a division of Hill, Chesson & Woody."[12]

18. The parties dispute their relative rights to the name Hill, Chesson and Woody and the HCW acronym. EBS claims that it "licensed" the use of Hill, Chesson & Woody to RFS, but RFS claims that the parties agreed that they would both use Hill, Chesson & Woody and the acronym "HCW" to market their respective businesses.[13]

19. There was no shared ownership between EBS and RFS, and they did not share in one another's revenues or profits and losses. EBS and RFS had separate bank accounts, filed separate tax returns, and did not share any employees.[14]  As described further below, EBS and RFS operated as separate businesses in shared office space from 2004 until 2010, and continued their referral relationship.

20. Additionally, RFS and EBS shared a client database, "SalesLogix." RFS and EBS each held their own licenses to the SalesLogix software, but the software was accessed through shared servers.[15]  Plaintiffs allege that at some undisclosed point in time, EBS terminated their right to access the SalesLogix database.[16]

21. In 2009 and 2010, Woody and Yates began to express to Drake that they were dissatisfied with the relationship between EBS and RFS and wanted the businesses to part

---

[11] Drake Aff. ¶¶43-44.
[12] Drake Aff. ¶¶ 19-23.
[13] 2010 Woody Aff. ¶¶ 9, 12, 16; Drake Aff. *passim*.
[14] Deposition of Wilton Drake 75.
[15] Drake Aff. ¶¶ 40-42; Woody Dep. 117-120; Drake Dep. 229-233.
[16] Drake Aff. ¶ 42.

ways.[17] Drake informed Woody and Yates that he was not interested in terminating the business relationship.[18]

        b.      *Prescott Office Management, LLC, Prestwick Six, LLC, and the Lease with RFS*

22.      In 2003, Yates, Woody, and Drake formed Prescott Office Management, LLC ("POM") for the purpose of purchasing an office condominium in which EBS and RFS could conduct business. Yates, Woody, and Drake each owned a one-third interest in POM.[19]

23.      The POM Operating Agreement originally provided that all three members would be managers of POM, and required unanimous approval of the members for all "decisions and commitments regarding LLC matters."[20] The Operating Agreement further allowed amendments to the Operating Agreement "made in writing and signed by Members holding 51% of the aggregate Company Ownership Interests."[21]

24.      In or after August 2003, POM, and non-parties Chesson Limited Partnership, and Hill Brothers, LLC formed Prestwick Six, LLC ("Prestwick"). POM owned 50% of Prestwick, Hill Brothers owned 37.5%, and the Chesson Limited Partnership owned 12.5%.[22]

25.      In 2004, Prestwick purchased an office condominium. EBS and RFS entered into a shared office space arrangement in that condominium, and executed separate leases with Prestwick for their portions of the office space. EBS leased 2/3 of the shared office space, and RFS leased the other 1/3.[23] Both EBS' and RFS' leases provided that "[t]his Lease shall automatically renew for an additional period of 3 years per renewal term, unless either party

---

[17] *Id.* ¶¶ 47-48; Woody Aff. ¶¶ 32-34.
[18] Drake Aff. ¶ 47.
[19] *See, e.g.*, Aff. Of Wil Drake Opp. Defs.' Mot. Compel Arb. ¶ 5 (Feb. 24, 2011).
[20] Affidavit of Todd Yates (Jan. 20, 2011) ("2011 Yates Aff.") Ex. A ("Operating Agreement") §§ 5.01, 5.02.
[21] *Id.*
[22] Drake Aff. ¶ 14.
[23] *Id.*

gives written notice of the termination no later than 60 days prior to the end of the term or renewal term."[24] Three other tenants, which are not parties to this lawsuit, also leased office space in the condominium (hereinafter "the non-party tenants"). [25] The tenants used common conference rooms, certain other common areas, and certain office equipment such as a phone system, postage meter, and copy machine. Usage charges for the equipment were billed to each of the individual tenants.[26]

26. All of the tenants' leases expired once on December 31, 2007, and were renewed automatically. The leases were set to expire again on December 31, 2010, and would again automatically renew for a new three-year term, absent notice of termination from Prestwick or a tenant. In 2009 and early 2010, some of the non-party tenants notified Prestwick that they would not renew their leases.[27] In addition, EBS notified Prestwick that it needed additional office space and would not renew its lease unless it could lease the space being rented to RFS and other space within the condominium.[28]

27. Faced with the prospect of losing its largest tenants, Prestwick's members decided it would be in Prestwick's best interest to not renew the RFS lease and to lease the RFS space and other vacated space to EBS.[29] Two members of Prestwick, Chesson Group and Hill Brothers, were in favor of not renewing RFS' lease.[30] RFS, however, did not want to vacate its space. Drake intended to use his ownership share in POM and the unanimity requirement in POM's Operating Agreement to prevent POM from voting in favor of not renewing the RFS lease.[31]

---

[24] Declaration of Earl Chesson Ex. A ("Lease") 1.
[25] *Id.* ¶ 16; Affidavit of Todd Yates (June 7, 2013) ("2013 Yates Aff.") ¶ 6.
[26] 2013 Yates Aff. ¶ 7.
[27] *Id.* ¶¶ 9, 22; Declaration of Earl Chesson ¶ 8.
[28] 2013 Yates Aff. ¶¶10, 22; Chesson Aff. ¶9.
[29] *Id.* ¶¶ 11, 22; Chesson Dec. ¶¶ 9-10.
[30] Chesson Dec. ¶¶ 11-12.
[31] Drake Dep. 280-84.

28.     Accordingly, in September 2010, Yates and Woody amended the POM Operating Agreement. The amendments changed the unanimity requirement to allow Prescott to act with the approval of 66% of its members, limited POM's managers to those "elected by a majority vote of the Members," and named Yates and Woody as the managers of POM.[32] Yates and Woody did not inform Drake that they were amending the Operating Agreement prior to the amendment. Drake does not dispute that Woody and Yates, who collectively held a 2/3 ownership interest in POM, had the authority under the Operating Agreement to amend the Agreement without his consent.[33]

29.     On September 10, 2010, Prestwick executed a Members Resolution not to renew the lease with RFS upon the completion of the current lease period on December 31, 2010.[34] Yates and Woody voted POM's 50% interest in Prestwick in favor of not renewing RFS' lease. Defendant Woody signed the Member Resolution on behalf of POM. On September 10, 2010, Prestwick notified RFS that its lease would not be renewed.[35] RFS moved out of the office condominium in mid-December, 2010.[36]

30.     From January 1, 2011 through December 31, 2012, Prestwick leased 87.5% of the space in the office condominium to EBS, and the other 12.5% to the remaining non-party tenant.[37]

### c.     The Trademarks

31.     In late 2004, Woody, on behalf of EBS, decided to redesign of the logo and graphics used by the businesses operating under the "Hill, Chesson & Woody" and "HCW"

---

[32] 2011 Yates Aff. Ex. B ("Amendment").
[33] Drake Aff. ¶ 16; Drake Dep. 283-84.
[34] Chesson Dec. ¶ 11; *id.* Ex. B.
[35] Chesson Dec. Ex. C.
[36] Drake Aff. ¶ 74.
[37] Yates Aff. ¶ 23.

brands.[38] The redesigned marks included a Logo (a stylized "H, C, & W" with a burgundy background) and Slogan ("Experience the Benefit") (the Logo, Slogan, and the term "Hill, Chesson, and Woody" are hereinafter collectively referred to as the "Marks").[39] EBS contends that it was exclusively responsible for both the redesign and for paying for the work behind the redesign.[40] Drake disputes this, and contends that he was heavily involved in the creation of the Marks and in paying for the redesign.[41]

32.     The redesign of the Marks was completed in 2005. On August 24, 2005, Chip Bremer ("Bremer"), an EBS employee, sent an email to Drake and others that they could begin using the Marks on August 25, 2005.[42] The email instructed the recipients to see Bremer "regarding approval of logo use."[43] On August 24, 2005, the same date as Bremer's email, Plaintiffs contend that RFS and Drake used the Logo and the Slogan on meeting materials distributed to potential clients of "RFS, EBS, and Chesson and Associates."[44] Woody also was present at the meeting on behalf of EBS.[45] Plaintiffs also contend that RFS and Drake used the Logo in correspondence with two other clients during the month of August.[46] Conversely, Plaintiffs contend that Defendants did not make use of the new Logo and Slogan until September 2005, citing to Yates' and Woody's email signatures and the trademark registration applications in support.[47] It is undisputed that EBS and RFS continued to use the Marks from in or around August 2005 until in or about November 2010.

---

[38] Chesson Aff. (Sept. 24, 2010) ¶12; Drake Aff. ¶ 24.
[39] There is a dispute of fact as to whether Plaintiff Drake was involved in the design of or financing for the Logo and Slogan. *See, e.g.*, Aff. of Joel Sheer ¶ 4; Drake Aff. ¶¶ 25-32.
[40] Chesson Aff. ¶12; 2010 Woody Aff. ¶ 12.
[41] Drake Aff. ¶¶ 24, 54.
[42] Defs.' NOF (July 25, 2014) Ex. 25.
[43] *Id.*
[44] Rives Aff. ¶ 5; Drake Aff. ¶ 33.
[45] Rives Aff.; *id.* Ex. 3; Drake Aff. ¶ 33.
[46] Rives Aff. ¶¶ 7-8; Drake Aff. ¶ 33; *id.* Exs. 43-46.
[47] Drake Aff. ¶ 34.

33.     On June 22, 2010, and August 9, 2010, Woody, on behalf of EBS, filed Application[s] for Registration or Renewal of Trademark or Service Mark with the North Carolina Secretary of State, seeking to register the Marks.[48] Woody signed the Applications under oath.  The Applications contained the following certification:

> The applicant is the owner of the mark, the mark is in use, and to the best knowledge of the person verifying the application, no other person has registered the mark in this State, or has the right to use the mark in this State either in the identical form thereof or in such near resemblance thereto as to be likely, when applied to the goods or services of the other person, to cause confusion, or to cause mistake, or to deceive.[49]

34.     At the time that Woody signed the Applications, he knew that EBS was not the sole owner of the Marks, but believed himself to be acting with the permission of Mr. Hill, the individual that he believed held ownership rights in the Marks.[50]  Woody also admitted that at the time he certified the Applications, he knew that others, including Plaintiffs, had a right to use the Marks, and that the information contained in the Applications is incorrect.[51]

35.     On June 28, 2010, the North Carolina Secretary of State issued to EBS State Trademark Registration Nos. T-20223 and T-20247, the state trademark registrations for the Logo and Slogan. On August 11, 2010, the Secretary of State issued No. T-20312, the state trademark registration for "Hill, Chesson & Woody."

36.     On August 13, 2010, counsel for EBS wrote a letter to Drake, asserting that "HCW Employee Benefits Services, LLC, Dan Hill, Earl Chesson or Skip Woody [were] the exclusive owners of the Marks."  The letter stated that Drake's use of the Marks had been permissive, and demanded that he acknowledge that use of the Marks had been by

---

[48] Drake Aff. Exs. 74-76.
[49] *Id.*
[50] Woody Dep. 190-92.
[51] *Id.*

permission, in exchange for which his permissive use of the Marks would extend to February 1, 2011.[52] If Drake refused to do so, he was required to cease using the Marks in seven days.[53]

37. On August 13, 2010, RFS and Drake filed a civil lawsuit in Orange County, North Carolina (No. 10 CVS 1447) alleging various claims against Defendants for improper registration and use of the Marks. Defendants subsequently answered and counterclaimed, asserting their right to the ownership and use of the Marks. On November 10, 2010, the Honorable Shannon Joseph issued a Preliminary Injunction prohibiting Plaintiffs from using the Marks.[54] In response, Plaintiffs began using a different logo, consisting of the letters "HCW" on a blue background with white letters (hereinafter, the "Emblem").[55]

38. On July 20, 2011, Defendant EBS, Defendant Woody, Defendant HCWI, and non-parties Dan Hill, Earl Chesson, and Earl G. Chesson, Inc. entered into a Trademark Assignment & License Agreement ("Trademark Agreement"). The Trademark Agreement states that it has "an effective date of September 9, 2010," and assigns Woody, Hill, and Chesson's interests in the Marks to Defendant EBS.[56] The Trademark Agreement further grants Hill and Chesson "royalty-free, worldwide, exclusive license(s)" to use the Marks in connection with marketing and sale of their respective products.[57]

## DISCUSSION

39. "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a

---

[52] Drake Aff. ¶ 53; *id.* Ex. 77; 2010 Woody Aff. ¶ 34.
[53] *Id.*
[54] HCW Ret. & Fin. Servs. v. HCW Empl. Benefit Servs., Orange Co. No. 10 CVS 1447 (N.C. Sup. Ct. filed Nov. 10, 2010) (order granting preliminary injunction).
[55] EBS Mem. Supp. Mot. Summ. J. 5; Drake Dep. 175-77. In his deposition, Drake stated that the letters stand for "Honor, Commitment, and Wisdom." Drake Dep. 176.
[56] Trademark Agreement 3-4, § 1.
[57] *Id.* 4, § 2.

matter of law.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (quoting Rule 56(c)). Any inference of fact should be drawn against the movant. *Forbis v. Neal*, 361 N.C. 519, 523-524 (2007) (citing *Caldwell v. Deese*, 288 N.C. 375, 378 (1975)). A genuine issue of material fact will require the court to preserve the issue for a finder of fact. *Bumpers v. Cmty. Bank of N. Va*, 367 N.C. 81 (2013). Although the court must view the record "in the light most favorable to the party opposing the motion," Rule 56(e) provides that summary judgment may not be defeated by "mere allegations or denials," but rather that the opposition must be supported by "specific facts showing that there is a genuine issue for trial." *Patterson v. Reid*, 10 N.C. App. 22, 28 (1970).

40.     Further, "Rule 56 does not require that a party move for summary judgment in order to be entitled to it. Thus, the trial court can grant summary judgment against the moving party." *Erthal v. May*, __ N.C. App. __, 736 S.E.2d 514, 523 (N.C. Ct. App. 2012) (internal quotations and citations omitted).

41.     Because it is not entirely clear from the Complaint which Claims are asserted against which Defendants, and because the issues addressed in the EBS Counterclaims and the affirmative defense of naked licensing are intertwined with the majority of Plaintiffs' Claims, the Court will address the motions for summary judgment collectively.

### Trademark Claims

42.     Plaintiffs' Second through Eleventh Claims for Relief, Defendants' Counterclaims, and Plaintiffs' affirmative defense of naked licensing all relate to the ownership of the disputed Marks, the parties' relative rights to those Marks, and the validity of the trademark registrations. The Court will therefore address these claims together.

43.     Generally speaking, ownership rights may be acquired through common law or statutory registration. As will be discussed below, ownership rights in a trademark are a necessary prerequisite to a claim for trademark infringement. Federal trademark rights are

governed by the federal Trademark Act of 1946 ("Lanham Act"), *codified at* 15 U.S.C. § 1051 *et seq.* Statutory trademark rights in North Carolina arise under the North Carolina Trademark Registration Act ("North Carolina Act"), codified at N.C. Gen. Stat. § 80-1 *et seq.* (hereinafter, references to the General Statutes will be to "G.S."). The Act explicitly identifies the Lanham Act as "persuasive authority." G.S. § 80-1.1.

*Obtaining Rights in a Trademark*

44.     Common law trademark rights are acquired by using the mark in commerce, that is, in connection with the sale of goods or services. *See, e.g.*, *Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 267 (4th Cir. 2003) ("At common law, trademark ownership is acquired by actual use of the mark in a given market."). Between competing users, priority of ownership in a mark is determined by the first use of the mark in a "genuine commercial transaction." *Id.* (quoting *Allard Enters., Inc. v. Adv. Programming Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998)).

45.     The Lanham Act provides for a federal registry of trademarks. 15 U.S.C. §§ 1051-1072, 1091-1096. Registration of a mark on the federal registry entitles the registrant to a presumption of ownership.  Federal registration, however, in not a prerequisite to seeking protection for a trademark under the Lanham Act.  Any party  who "believes that he or she is likely to be damaged by" the use of a mark in commerce that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities" may bring a claim under the federal Lanham Act. 15 U.S.C. § 1125(a). In essence, a successful claim for violation of this provision must show that the purported infringer used a word, symbol, or combination thereof in commerce that is likely to cause confusion or deceive as to the origin of the goods or services, or that misrepresents the nature or origin of goods or services. That individual may then be liable to

"any person who believes that he or she is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1).

46.     North Carolina also maintains a trademark registry as a "system of State trademark registration and protection substantially consistent with the federal system of trademark registration and protection." G.S. § 80-1.1. Though registration of a mark is required to obtain relief under the North Carolina Act, *see* G.S. § 80-11, the North Carolina Act explicitly provides that "nothing [in the statute] shall adversely affect the rights or the enforcement of rights in marks acquired in good faith at any time at common law." G.S. § 80-13.

47.     Under the North Carolina Act, any person who uses a mark, or controls the nature and quality of the goods or services in connection with a mark, may submit an application to register the mark on the North Carolina trademark registry. The application must, among other things: (1) state the date that the mark was first used in commerce in North Carolina by the applicant, the applicant's business predecessor, or someone under the applicant's control; and (2) state that "the applicant is the owner of the mark, that the mark is in use, and that to the best of the knowledge of the person verifying the application, no other person . . . . has the right to use the mark in this State either in the identical form thereof or in such near resemblance thereto as to be likely, when applied to the goods or services of the other person, to cause confusion, or to cause mistake, or to deceive." G.S. § 80-3. The North Carolina Act thus incorporates the common law standard of priority of use for establishing ownership.

48.     The North Carolina Act also provides for cancellation of a mark upon a finding by a court of competent jurisdiction that the mark has been obtained improperly, fraudulently, by materially false statements, or by one who is not the proper owner of the mark. G.S. § 80-8. The Act further provides that anyone who registers a mark by "knowingly

making any false or fraudulent misrepresentation or declaration . . . . shall be liable to pay all damages sustained in consequence of filing or registration, to be recovered by or on behalf of the party injured thereby." G.S. § 80-10. A violation of this provision of G.S. § 80-10 is also an unfair or deceptive trade practice, in violation of G.S. § 75-1.1. G.S. § 80-12.

49.     Protectable rights in a trademark, including the right to use the trademark in commerce and to exclude others from using that particular mark, are largely analogous to other types of property rights. *Emergency One*, 332 F.3d at 267. As with other forms of property, the rights in the trademark may be assigned to another individual or company. *See, e.g.*, *ICEE Distribs. v. J&J Snack Foods Corp.*, 325 F.3d 586, 593 (5th Cir. 2003). The owner may also authorize, or license, the use of the mark by another, so long as the owner retains adequate control over the "nature and quality of the goods or services in connection with which the mark is used." *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2nd Cir. 1959) (quoting 15 U.S.C. § 1127). A failure to do so may result in "naked licensing," amounting to abandonment of rights in the trademark. *See, e.g.*, *Eva's Bridal Ltd. v. Halanick Enters.*, 2010 U.S. Dist. LEXIS 79186, at *3-4 (N.D. Ill. 2010) ("Abandonment, whether by naked licensing or otherwise, results in 'the loss of trademark rights against the world.'" (quoting *TMT N. America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997))).

*Plaintiffs' Claims*

50.     Both Plaintiffs and EBS contend that they own protectable interests in the Marks.[58] Plaintiffs also contend that the state trademark registrations issued to EBS should be cancelled because the registrations were obtained based on false and materially incorrect

---

[58] The parties have not expressly sought protection of, or claimed infringement in, the acronym "HCW". Rather, the marks at issue in this case are the name "Hill, Chesson & Woody", the Logo and the Slogan.

information. Plaintiffs further contend that they were the first to use the Logo and Slogan after they were created and, accordingly, have the priority of first use in those Marks. Finally, Plaintiffs argue that they have an ownership interest in the Marks because they are a "division" of Hill, Chesson & Woody. EBS contends that it owns the Marks because Plaintiffs used the Marks by virtue of a license granted by EBS that has since been revoked.[59] EBS also asserts that its registrations of the Marks with the North Carolina Secretary of State were valid, and should not be cancelled.

51. The Court will first address the claims related to EBS' registration of the Marks with the North Carolina Secretary of State. In essence, Plaintiffs' Third through Eleventh Claims allege that EBS obtained the registrations for the Marks based on false information, or by fraud, and seek cancellation of EBS' registrations. Plaintiffs' Third, Sixth, and Ninth Claims ask for this Court to cancel the registrations for the contested Marks pursuant to G.S. § 80-8, contending that the application for registration incorrectly stated that no other person had the right to use the Marks in North Carolina commerce. Similarly, Plaintiffs' Fourth, Seventh, and Tenth Claims appear to seek cancellation of the registrations pursuant to G.S. § 80-8 because EBS was not "the owner" of the Marks at the time that the registrations were filed. Plaintiffs' Fifth, Eighth, and Eleventh Claims for relief allege that the registrations were obtained fraudulently, and that Plaintiffs are therefore entitled to both cancellation and damages pursuant to G.S. § 80-12 and Chapter 75 of the North Carolina General Statutes.

52. It is undisputed that Woody executed all three trademark applications before EBS owned the rights in the Marks, and that Woody was aware that Hill, and not EBS, owned the Marks at the time at the time the applications were filed.[60] Woody also admitted

---

[59] EBS Mem. Supp. Mot. Summ. J. 3, 4; Drake Dep. 178-80.
[60] Woody Dep. 187, 190-92, 193-96.

that Plaintiffs had a right to use the Marks at the time the applications were filed. Accordingly, it is undisputed that Woody provided false information in the applications.

53. Furthermore, the Trademark Agreement, even if valid, does not cure the deficiencies in the applications since it makes the trademark rights effective September 9, 2010, which falls after the June and August 2010 dates on which Woody executed the registration applications.

54. The false information provided by Woody in the applications for registrations violated G.S. §80-3. The Court therefore concludes that EBS' motion and Yates' & Woody's motion for summary judgment should be GRANTED against EBS, and in favor of Plaintiffs, as to Plaintiffs' Third, Fourth, Sixth, Seventh, Ninth, and Tenth Claims, to the extent that those Claims seek cancellation of the Mark registrations.[61] Accordingly, the registrations for the Marks should be canceled pursuant to G.S. § 80-8(4)(b), (c), and (f).

55. As to Plaintiffs' Fifth, Eight, and Eleventh Claims, there is a dispute of fact as to whether Woody's submission of the applications was intended to defraud the Secretary of State, particularly in light of his testimony that he believed himself to be acting properly with the permission of Mr. Hill. The Court declines to find that G.S. § 80-8(d) or G.S. § 80-10 applies to the registrations, and finds that summary judgment should be DENIED as to the Fifth, Eighth, and Eleventh Claims for Relief. Based upon this conclusion, Plaintiffs are also not entitled to relief under G.S. § 80-12 or G.S. § 75-1.1 at this stage.

56. As discussed *supra*, common law trademark rights are acquired by using the mark in commerce, that is, in connection with the sale of goods or services, and priority of ownership in a mark is determined by the first use of the mark in a "genuine commercial

---

[61] The Fourth, Seventh, and Tenth Claims are entitled "Defendant EBS Is Not the Owner of [Each Respective Mark]." To the extent that Plaintiffs seek a declaratory judgment to this effect, the Court finds that summary judgment is improper.

transaction." *Emergency One*, 332 F.3d at 267 (citation omitted). It is undisputed that Woody has used the name "Hill, Chesson & Woody" in commerce since 2000, when the individuals Woody, Hill, and Chesson entered into business together, and that EBS used "Hill, Chesson & Woody" in commerce as early as 2002, well prior to Plaintiffs' use of that mark.[62] Accordingly, the Court concludes that EBS' and HCWI's motions for summary judgment as to Plaintiffs' Second Claim, to the extent that the Claim is based on use of the mark "Hill, Chesson & Woody," should be GRANTED.

57. As to the Logo and Slogan, EBS contends it is the owner of the Marks, including the Logo and Slogan, and that Drake and RFS used the Marks as licensees only. Accordingly, EBS argues that Drake's and RFS' use of the Logo and Slogan on or after August 24, 2005, could not establish the first use priority since Drake and RFS had the right to use the Marks only by permission and any use they made "inures to EBS."[63] The parties did not have a written licensing agreement`. Instead, EBS argues that Drake admitted he was using "Hill, Chesson & Woody" by permission, and that EBS oversaw and approved the use of the Marks by Drake and RFS.[64] As discussed above, Drake contends that he and RFS participated in the development of, and helped pay for, the Logo and Slogan, and have an ownership interest in the Logo and Slogan.

58. The parties dispute when and by whom the Logo and Slogan were first used in commerce. An email dated August 24, 2005, from Chip Bremer, an EBS employee, to Plaintiff Drake and others, announced that the new logo and website would be "launched" the on August 25, 2005.[65] EBS contends that it first used the Marks on the evening of August 25,

---

[62] Woody Aff. ¶¶ 5-11; *see* Drake Dep. 58.
[63] EBS' Reply Supp. Mot. Summ. J. 4-5, 6-7.
[64] *Id.* at 4-5
[65] Def. July 25, 2014 Notice of Filing Ex. 25.

2005, when it launched a redesigned website.[66] Drake and RFS, however, contend that they used the Logo and Slogan on a meeting agenda provided to potential clients on August 24, 2005.[67] Defendant Woody also was present at and participated in this meeting, presumably on behalf of EBS.[68]

59. The facts regarding the ownership and first use of the Logo and Slogan are in dispute. Accordingly, the Court concludes that summary judgment is inappropriate as to any claims arising out of the Logo and Slogan.

*EBS' Counterclaims*

60. EBS has alleged counterclaims for infringement of the Marks, for a declaration that EBS and the individuals Hill, Chesson and Woody own the Marks, and for a permanent injunction enjoining Plaintiffs from using the Marks and the Emblem.

61. EBS' First Counterclaim is brought under the Lanham Act, 11 U.S.C. §1125 *et seq.*, for trademark infringement. EBS alleges that "Plaintiffs' use of the Marks and the Emblem is likely to cause confusion, . . . or to deceive the public as to the affiliation, connection, or association of Plaintiffs with Defendants . . . ."[69] The Second Counterclaim is for trademark infringement under the North Carolina Trademark Registration Act, and for violation of the North Carolina Unfair and Deceptive Trade Practice Act, N.C.G.S. §75-1.1, and is based on the allegation that the Emblem is likely to cause confusion or deceive the public.[70]

62. As a preliminary matter, the Court already has concluded that issues of material fact exist as the ownership of, and the parties' respective rights in, the Logo and the

---

[66] EBS' Reply Supp. Mot. Summ. J. at 7.
[67] Drake Aff. ¶ 33; Rives Aff. ¶¶ 5-6; *id.* Ex. 3 ("Meeting Agenda").
[68] *Id.*
[69] Countercl. ¶18.
[70] *Id.* ¶ 24.

Slogan.[71] Accordingly, to the extent the cross-motions seek summary judgment regarding EBS' claims that Plaintiffs have infringed on EBS' rights in the Logo and Slogan, those motions are DENIED. The Court's consideration of EBS' counterclaims for trademark infringement is now limited to whether Plaintiffs' use of the Emblem infringes on EBS' trademark in "Hill, Chesson & Woody."

63. EBS contends that after the preliminary injunction was entered, Plaintiffs began using the Emblem and that the Emblem is "confusingly similar to EBS' marks and [was] made in a bad faith attempt to continue trading off of EBS' name and goodwill."[72] EBS further contends that "[t]he acronym 'HCW' was and still is commonly used to refer to 'Hill, Chesson & Woody' and EBS."[73]

64. The Court already has concluded that EBS obtained its trademark registrations from the North Carolina Secretary of State improperly by means of materially false statements. Accordingly, EBS lacks standing to pursue a claim for infringement under the North Carolina Trademark Registration Act. G.S. § 80-11 (permitting "a civil action by the owner of [a] registered mark"). Plaintiffs' motion for summary judgment as to EBS' claim for violation of North Carolina Trademark Registration Act in its Second Counterclaim should be GRANTED. Accordingly, the EBS motion as to the Second Counterclaim should also be GRANTED in Plaintiffs' favor.

65. However, the Court reaches a different conclusion as to EBS' claim for violation of the Lanham Act as to the "Hill, Chesson & Woody" mark. Trademark infringement occurs under the Lanham Act when the claimant owns a valid trademark and the defending party's use of a similar mark is likely to cause confusion. 15 U.S.C. § 1125(a). To determine whether

---

[71] In addition, EBS does not allege that Plaintiffs used the Logo and Slogan after entry of the preliminary injunction.
[72] EBS Mem. Supp. of Mot. Summ. J. 20.
[73] EBS Opp. Pls.' Mot. Summ. J. 6.

there is a likelihood of confusion, courts consider "(a) the strength or distinctiveness of the mark; (b) the similarity of the two marks; (c) the similarity of the goods/services the marks identify; (d) the similarity of the facilities the two parties use in their businesses; (e) the similarity of the advertising used by the two parties; (f) the defendant's intent; [and] (g) actual confusion." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984) (citation omitted). When there is no question of material fact as to likelihood of confusion, courts will enter summary judgment for the owner of a trademark and enjoin the other user. *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.,* 148 F.3d 417, 424 (4th Cir. 1998).

66. Here, the Court is limited to the issue of whether Plaintiffs' use of the Emblem infringes on EBS' rights in the mark "Hill, Chesson & Woody," and must apply the above-cited factors to those two marks.

67. The evidence is undisputed that "Hill, Chesson & Woody" is a strong and distinctive brand in the field of insurance and investment services in the local area. On the other hand, the Emblem is not similar to the name "Hill, Chesson & Woody", although there is some association between the acronym "HCW" and "Hill, Chesson & Woody."[74]

68. There is a dispute of fact regarding the similarity of the services offered by EBS and RFS. EBS "conduct[s] business related to the delivery of employee group health plans, products and services."[75] Drake and RFS are involved in the "sale, service, and support of pension and retirement plans, executive benefits, life insurance, disability insurance, asset management, and financial planning."[76] Nevertheless, EBS and RFS do not operate in such distinct consumer marketplaces that consumer confusion is impossible. *See Pizzeria Uno Corp.,* 747 F.2d at 1535.

---

[74] This is not to say that the Emblem does not bear similarities to the Logo, but infringement of the Logo is not under consideration at this stage of the proceeding.
[75] 2010 Woody Aff. ¶ 10; Countercl. ¶3.
[76] Drake Aff. ¶ 3.

69.     Neither party has presented any substantial evidence regarding the use of the Emblem in RFS' advertising.  EBS offers only a comparison of the home pages of EBS' and RFS' respective websites, which share only a passing similarity.[77]

70.     With regard to Plaintiffs' intent in using the Emblem, Plaintiffs' evidence creates an issue of fact.  Drake has admitted the significant value of the Hill, Chesson & Woody brand.  He has retained the acronym "HCW" as part of the RFS name despite his disassociation from Hill, Chesson & Woody.  In addition, RFS started using the Emblem only because it was enjoined from using the Marks, and Drake admitted he would resume using Hill, Chesson & Woody if he prevails in this lawsuit.[78] These facts suggest Plaintiffs are intending to continue to derive the benefits of their prior association with Hill, Chesson & Woody by using the Emblem.  Drake, however, testified that he was in the process of "rebranding" his business to establish that "HCW" would stand for the values of "Honor, Commitment, and Wisdom".[79] As this Court is not permitted to make credibility determinations in deciding a motion for summary judgment, this testimony creates at least some issue of fact regarding Plaintiffs' intent.

71.     Drake has admitted that there has been some actual confusion about his continued association with Hill, Chesson & Woody, albeit only among "former clients and people that were aware of the association prior to that date."[80] *Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.,* 43 F.3d 922, 937 (4th Cir. 1995) (Evidence of actual confusion "is entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion.").  Drake testified that approximately 10 former clients have inquired about his

---

[77] July 25, 2014 Notice of Filing Exs. 20 & 21.
[78] Drake Dep. 136-37, 175-77, 180-81.
[79] *Id.* at 136, 175-76.
[80] *Id.* at 201-02.

continued association with Hill, Chesson & Woody.[81] EBS, however, has failed to place this evidence in context by providing, for example, RFS' total number of clients and former clients. *See Petro Stopping Ctrs., L.P. v. James River Petroleum*, 130 F.3d 88, 95 (4th Cir. 1997) (stating that evidence of actual confusion must be placed in context, and evidence of few instances of confusion in light of large volume of business done by the plaintiff was "meager evidence of actual confusion" and "at best de minimis"); *J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition* §23:14 (4th ed. 2015) ("Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence."). EBS has not provided any additional evidence of actual confusion. Accordingly, the Court cannot give this evidence undue weight.

72. Generally, "[t]he likelihood of confusion is a factual issue dependent on the circumstances of each case." *Resorts of Pinehurst, Inc.,* 148 F.3d at 422; *Petro Stopping Ctrs., L.P.,* 130 F.3d at 91-92. On balance, the Court concludes that there are disputed material facts underlying the question of whether RFS' use of the Emblem is likely to cause confusion among consumers. Accordingly, EBS' and RFS' motions for summary judgment regarding EBS' First counterclaim for trademark infringement under the Lanham Act should be DENIED.

*Naked Licensing*

73. As an affirmative defense to EBS' claims for violation of its rights in the trademark "Hill, Chesson and Woody," Plaintiffs have asserted that EBS granted Plaintiffs a "naked license," and therefore may not now bring a claim for violation of the mark.

---

[81] *Id.*

74. Though a trademark owner can license use of the mark by others, "where the licensor fails to exercise adequate quality control over the licensee, 'a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark.'" *Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 596 (9th Cir. 2002) (quoting *Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992)). Because such relinquishment of rights is involuntary, "the proponent of a naked license theory faces a stringent standard of proof." *Id.* (citations and quotations omitted).

75. Here, the Court has concluded that EBS, along with the individuals Hill, Chesson, and Woody, hold superior rights to the Hill, Chesson and Woody Mark over Plaintiffs. It is also undisputed, however, that Plaintiffs made use of the Mark in commerce for several years. To defeat Plaintiffs' affirmative defense, EBS must show that it has exercised "adequate control" over Plaintiffs. Ultimately, a licensor must demonstrate that it has taken measures to ensure that the quality of the goods or services offered under the licensed mark, such that consumers are not misled as to the nature or quality of what is offered under the mark. *Barcamerica,* 289 F.3d at 596-98; *FreecyclingSunnyvale v. Freecycle Network*, 626 F.3d 509, 516 (9th Cir. 2010); *Ray Lackey Enters. v. Vill. Inn Lakeside, Inc.*, 2015 NCBC 32 at ¶ 38 (N.C. Super. Ct. Apr. 2, 2015).

76. The absence of a written agreement is not dispositive on the issue of naked licensing. *Barcamerica,* 289 F.3d at 596; *FreecyclingSunnyvale*, 626 F.3d at 516. Nevertheless, the licensor must still demonstrate that it "in fact exercised sufficient control over its licensee," or that it "justifiably relied on [the licensee's] quality control measures," though justifiable reliance is not sufficient on its own to show that a naked license has not been granted. *Freecycling Sunnyvale*, 626 F.3d at 517-519.

77. EBS argues that the amount of supervision required under this standard is minimal.[82] EBS argues that Chip Bremer, an EBS employee, supervised use of the Marks, including "enforcing EBS' brand standards, approving uses of the marks, and requiring revisions of materials that did not meet the standards."[83] In his deposition, Drake acknowledged that Bremer, as "marketing and communications specialist," oversaw Hill, Chesson & Woody's branding, and stated that Bremer's purpose "was to keep the brand consistent."[84]

78. The Court is skeptical that this type of oversight indicates control over the quality of Plaintiffs' products. Rather, Bremer's role seems to indicate that he exercised control over the use and placement of the mark "Hill, Chesson and Woody" itself. Furthermore, EBS has produced voluminous, uncontradicted evidence to indicate that EBS and RFS operated separately, and EBS has not alleged that it exercised any sort of "quality control" over RFS' products or services. *See FreecycleSunnyvale*, 626 F.3d at 517 (finding a limitation that a mark not be used for commercial purposes was insufficient to show adequate quality control).

79. On the other hand, EBS and RFS shared office space, which would suggest that EBS had at least some opportunity to monitor RFS' operations, however minimal. Additionally, evidence submitted by EBS indicates that part of their desire to separate RFS from the Hill, Chesson and Woody brand stemmed from a decrease in the quality of the services provided by RFS.[85]

80. In light of the "stringent standard" that a challenger to a mark must show to assert naked licensing, the Court finds that a question of fact, however slim, still exists as to

---

[82] EBS' Mem. Supp. Mot. Summ. J. 24.
[83] *Id.* at 24-25.
[84] Drake Dep. 132-33, 146.
[85] 2010 Woody Aff. ¶¶ 25-34; 2010 Hill Aff. ¶¶ 18-19; Hill Dep. 88-95; Woody Dep. 156-57, 172-73.

the extent of control exercised by EBS over Plaintiffs' use of the "Hill, Chesson and Woody" mark. Accordingly, the Court concludes that summary judgment is inappropriate, and summary judgment is DENIED as to Plaintiffs' affirmative defense for naked licensing.

*Declaratory Judgment and Injunction*

81.     Finally, as to EBS' counterclaims for declaratory judgment and permanent injunction, EBS' motion is GRANTED, in part, and DENIED, in part. Insofar as EBS seeks a declaration from this Court that EBS and the individuals Hill, Chesson and Woody are the owners of the name "Hill, Chesson and Woody," the EBS motion is GRANTED. Further, insofar as EBS seeks an injunction permanently enjoining Plaintiffs from using the name "Hill, Chesson and Woody" in commerce, the EBS motion is GRANTED. Except as granted herein, EBS' motion is DENIED.

<u>Partnership Claims</u>

*Partnership Obligations*

82.     Plaintiffs' First Claim for Relief contends that the relationship between RFS and EBS constituted a *de facto* partnership operating under the trade name of "Hill, Chesson and Woody" and "HCW." Plaintiffs allege that EBS violated the partnership agreement and the fiduciary obligations owed by EBS to RFS by attempting to appropriate the Marks. In Plaintiffs' Fourteenth Claim for Relief, Plaintiffs assert that they are entitled to an "accounting of partnership affairs" because EBS has "terminated the partnership that existed."

83.     The Court of Appeals has held:

"A partnership is an association of two or more persons to carry on as co-owners a business for profit." N.C. Gen. Stat. § 59-36(a) (2011). A more detailed description is that it is "a combination of two or more persons of their property, effects, labor, or skill in a common business or venture, under an agreement to share the profits or losses in equal or specified proportions, and constituting each member an agent of the others in matters appertaining to the partnership and within the scope of its business." *Zickgraf Hardwood Co. v. Seay*, 60 N.C.

App. 128, 133, 298 S.E.2d 208, 211 (1982). A *de facto* partnership may be found by examination of a parties' conduct, which shows a voluntary association of partners. *Potter v. Homestead Preservation Assn.*, 330 N.C. 569, 576, 412 S.E.2d 1, 5 (1992). However, "co-ownership and sharing of any actual profits are **indispensable requisites** for a partnership." *Wilder v. Hobson*, 101 N.C. App. 199, 202, 398 S.E.2d 625, 627 (1990).

*Best Cartage, Inc. v. Stonewall Packaging, LLC*, 219 N.C. App. 429, 437-38 (2012) (emphasis added); *La Familia Cosmovision, Inc. v. Inspiration Networks*, 2014 NCBC 51 at ¶ 34 (N.C. Super. Ct. Oct. 20, 2014).

84.     It is undisputed that RFS and EBS had not entered into a formal partnership agreement.[86]  Nonetheless, Plaintiffs contend that the relationship between RFS and EBS constituted a *de facto* partnership, in which a partnership "may be inferred" where the "circumstances demonstrate a meeting of the minds with respect to the material terms of the partnership agreement." *Compton v. Kirby*, 157 N.C. App. 1, 11 (2003) (citations omitted). The facts, however, wholly fail to support this contention.

85.     Most significantly, Drake admitted that that EBS and RFS did not share in one another's profits or losses.[87]  Drake further admitted that the only revenues that RFS received from EBS were generated by client referrals, that the revenues were not shared with the referring company once they were earned, and that receiving referrals was insufficient to create a partnership.[88]  Additionally, there is no question that all net income from RFS was distributed solely to the members of RFS, while all net income from EBS was distributed solely to members of EBS.[89]  Plaintiffs argue that while EBS and RFS did not share profits, they did share certain expenses related to marketing and promotions.[90]  They point to no

---

[86] Pls.' Resp. to Defs.' First Set of Requests for Admissions ¶ 1.
[87] Drake Dep. 116-17; Woody Aff. ¶ 22.
[88] Drake Dep. 116-17
[89] Pls.' Resp. to Defs.' First Set of Requests for Admissions ¶¶ 21 & 25.
[90] Pls.' Br. Opp. EBS' Mot. Summ. J. 7-8.

authority, however, that suggests that the mere sharing of certain expenses between businesses creates a partnership.

86. The undisputed facts also establish that EBS and RFS did not combine their property and labor in a common business or venture. EBS and RFS never shared bank accounts or title to any real or personal property,[91] did not have any common employees[92] or file shared income tax returns,[93] and each had its own separate lease to the office space.[94] Payments for office equipment shared by RFS and EBS were paid from separate accounts.[95] Further, EBS never held Drake out as a partner, never contributed capitol to Drake, and never designated Drake as an agent.[96]

87. In addition, Plaintiffs admitted that RFS and EBS were each run as separate companies.[97] Managers, members, and employees of RFS were solely responsible for managing and operating RFS, and the managers, members, and employees of EBS were solely responsible for managing and operating EBS. [98]

88. Based upon the foregoing, the Court concludes that the record evidence overwhelmingly establishes, as a matter of law, that EBS and RFS were not in a *de facto* partnership relationship. EBS' Motion as to Plaintiffs' First Claim for Relief should therefore be GRANTED.

89. Because the Court concludes that no partnership existed between RFS and EBS, there remains no basis for Plaintiffs' Fourteenth Claim for Relief. EBS' Motion as to Plaintiffs' Fourteenth Claim for Relief should therefore also be GRANTED.

---

[91] Drake Dep. 118; Woody Aff. ¶ 22.
[92] Pls.' Resp. to Defs.' First Set of Requests for Admissions ¶ 7.
[93] Pls.' Resp. to Defs.' First Set of Requests for Admissions ¶ 12.
[94] Drake Dep. 75; 2010 Woody Aff. ¶ 22.
[95] Drake Dep. 117-118.
[96] Drake Dep. 158-167, 175.
[97] *Id.* at 120.
[98] Pls.' Resp. to Defs.' First Set of Requests for Admissions ¶¶ 23 & 29.

*Breach of Good Faith and Fiduciary Obligation*

90.     Plaintiffs' Twelfth and Thirteenth Claims for Relief both rise or fall on the existence of a duty owed by Yates and Woody to Drake by virtue of their relationship in POM. It is undisputed that Yates and Woody were member/managers of POM during the time at issue. Accordingly, the Court will address both Claims together.

91.     Plaintiffs' Twelfth Claim for Relief alleges that Yates and Woody[99] breached a duty of good faith they owed to Drake by amending POM's Operating Agreement to vest control of POM in their hands, and then voting POM's ownership share in Prestwick in favor of not renewing RFS' lease for the office space. Similarly, Plaintiffs' Thirteenth Claim for Relief contends that Yates and Woody, as "controlling" members of POM by virtue of their "unilateral" amendment of the POM Operating Agreement, owed a fiduciary duty to Drake as the minority member. Plaintiffs argue that Drake has been damaged by the costs that he has incurred in relocating his business, having his business disrupted, and having to pay higher rent costs in a newer location. Plaintiffs also argue that Yates and Woody's actions in orchestrating the new lease between EBS and Prestwick, and leasing the space to EBS for what Plaintiffs contend are less favorable terms, diminished Drake's membership interest in POM.

92.     A fiduciary relationship exists under North Carolina law where "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . .,[and] it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other." *Dalton v. Camp*, 353 N.C. 647, 651-52 (2001) (internal quotations omitted) (citing *Abbitt v.*

---

[99] As stated *supra*, POM is the Defendant in *Drake v. Prescott*, but is not a party to any of the claims at issue in this Order.

*Gregory*, 201 N.C. 577, 598 (1931)). "[O]nly when one party figuratively holds all the cards – all the financial power or technical information, for example – have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *Kaplan v. O.K.Techs., L.L.C.*, 196 N.C. App. 469, 475 (2009) (citation omitted).

93. As an initial matter, members of a limited liability company ordinarily owe no duty to one another under North Carolina law. *BOGNC, LLC v. Cornelius NC Self-Storage, LLC*, 2013 NCBC 26 at ¶43 (N.C. Super. Ct. May 1, 2013) (citing *Kaplan v. O.K. Techs., LLC*, 196 N.C. App. 469, 472 (2009)). In certain circumstances, however, a controlling owner of a company may owe a fiduciary duty to minority owners. *Id.; Island Beyond, LLC v. Prime Capital Grp., LLC*, 2013 NCBC 51 at ¶ 36 (N.C. Super. Ct. Oct. 30, 2013) ("In some instances, a majority member owes the minority members a fiduciary duty that prevents the use of the majority vote to harm the minority.").

94. Drake claims that Yates and Woody, as "controlling" members of POM, owed him a fiduciary duty, and that their actions in amending the POM Operating Agreement and later voting to terminate RFS' lease breached this duty. The Court is not persuaded by this argument. It is undisputed that Yates, Woody, and Drake each own a one-third interest in POM, meaning that there is no single controlling owner with the authority to compel the company to act.[100] Drake voluntarily signed an Operating Agreement that permitted amendment of the Agreement with 51% membership approval. Further, he admitted in an affidavit and again at his deposition that Yates and Woody acted within the scope permitted by the POM Operating Agreement.[101] As in *BOGNC, LLC*, Drake "cannot claim a fiduciary

---

[100] *See, e.g.*, Drake Aff. Opp. Mot. Compel Arb. ¶ 5.
[101] Drake Dep. 283-84; Drake Aff. ¶ 16.

duty was owed to [him] as [a] minority member[] simply because [Yates and Woody] out voted [him]." 2013 NCBC 26 at ¶44.[102]

95. There is also no evidence in the record before the Court to support the existence of a duty owed by Yates and Woody to Plaintiffs by virtue of their managerial roles in POM. Yates, Woody, and Drake were all identified as member/managers in the original Prescott Operating Agreement. As a result of the amendment, Yates and Woody are now the sole managers of POM.

96. It is true that both Chapter 57C, the North Carolina LLC Act in place at the time this lawsuit was initiated, and 57D, the LLC Act as amended, provide that LLC managers owe certain duties to the company and are to discharge their duties in good faith. G.S. § 57C-3-22(b); G.S. § 57D-3-21(b). However, these duties are owed to the company, not to other managers or members of the LLC. *See, e.g.*, *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473-74 (2009) (comparing the duties owed by a manager of an LLC to those owed by a director to a corporation). Accordingly, members of a LLC may not ordinarily pursue individual causes of action against third parties for injuries to the company. *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658 (1997) (identifying two exceptions to the general rule that a shareholder may not pursue an individual cause of action for harm to the company: (1) when there is a special duty between the wrongdoer and the shareholder, and (2) an injury

---

[102] The Court acknowledges that North Carolina courts have found a fiduciary duty arising from majority membership in corporations when the majority ownership was split between multiple shareholders. *See, e.g.*, *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390 (2000). However, as this Court has discussed in previous opinions, a limited liability company is fundamentally different from a corporation in several ways, including the ability of parties to an LLC operating agreement to alter statutory default rules. *See Blythe v. Bell*, 2013 NCBC 18 ¶¶ 17-21 (N.C. Super. Ct. Apr. 8, 2013) (declining to extend the *Nash Johnson* line of cases to LLCs "in no small part because of the freedom to contract granted to LLC members to obtain minority protections not available to shareholders of the closely-held corporation"). It would undermine the contractual nature of an Operating Agreement, particularly one that, as here, allows for certain actions with majority approval, if a member were able to assert the vulnerability of a minority member upon a permitted action by the other two equal owners of the LLC.

to the plaintiff that is "separate and distinct" from the harm suffered by other shareholders); *Dawson v. Atlanta Design Assoc., Inc.*, 144 N.C. App. 716, 719 n. 1 (2001) (applying the so-called "*Barger* Rule" to limited liability companies); *see also Maurer v. Maurer*, 2013 NCBC 44 ¶24 (N.C. Super. Ct. Aug. 23, 2013) (stating that there is no "black letter rule allowing a minority shareholder to pursue an individual action against a controlling shareholder when a derivative claim would be adequate to protect the asserted rights of both the corporation and the minority owner"); *Blythe v. Bell*, 2013 NCBC 18 ¶¶ 17-21 (N.C. Super. Ct. Apr. 8, 2013) (noting that *Norman v. Nash Johnson & Sons*, 140 N.C. App. 390 (2000), allowing for certain direct shareholder claims arising from injury to a closely held corporation, included "peculiar and egregious facts [that] would champion corporate form over injury to the corporation" and ultimately "may be understood to find on their particular facts a 'special duty' . . . . thus satisfying the *Barger* rule").

97. Plaintiffs have not named POM as a party to this lawsuit or given any other indication that Drake is pursuing this lawsuit derivatively on behalf of POM. Further, Plaintiffs' asserted damage to POM – an alleged decrease in income resulting from the change in lease terms – could arguably be remedied by a derivative action. For Drake to be able to individually take action against Yates and Woody for a breach of a duty, he must therefore be able to demonstrate that he meets the *Barger* exceptions: that Yates and Woody owed him a special duty of good faith separate and apart from the duty that they owed as managers to POM, or that Drake suffered a separate and distinct injury.

98. As discussed above, the Court is not persuaded that Yates and Woody owed Drake any special duty by virtue of their status as member/managers in POM. There is nothing in the record evidence before the Court to show that Drake placed special reliance on Yates and Woody, or that they wrongfully induced him to become a member of POM.

99. Plaintiffs have also not presented the Court with any evidence that Drake, the only Plaintiff member of POM, was personally harmed, much less in a "separate and distinct way," by Yates' and Woody's actions. Plaintiffs allege only that Drake has been harmed by the need to relocate his business and by a decrease in the value of his ownership share by virtue of the change in lease terms. North Carolina courts have repeatedly stated that a decrease in the financial value of company ownership as a result of an action taken by those in charge of the company does not constitute a "separate and distinct" injury. *Allen v. Ferrera*, 141 N.C. App. 284, 290 (2000); *Grasinger v. Williams*, 2015 NCBC 5 ¶ 26 (N.C. Super. Ct. Jan. 15, 2015). It is also undisputed that the Plaintiff party to the terminated lease – RFS – is not a member of POM. Plaintiffs have not provided any evidence to support a conclusion that Yates and Woody, in their roles as member/managers of POM, owed RFS, a non-member of Prescott, any sort of fiduciary duty.

100. Based upon the foregoing analysis, the record before the Court does not demonstrate any sort of duty owed by Yates and Woody to Plaintiffs, much less a breach of those duties. The Court therefore need not undertake further analysis as to whether Yates' and Woody's actions constituted a breach of any duty.

101. Accordingly, the Court concludes that Yates' and Woody's Motion for Summary Judgment should be GRANTED in favor of Yates and Woody as to Plaintiffs' Twelfth and Thirteenth Claim for Relief.

### Breach of Lease Agreement

102. In Plaintiffs' Fifteenth Claim for Relief, Plaintiffs contend that Prestwick "interfered with the peaceful use and enjoyment of the leased premises by [ ] RFS, and restricted and limited [RFS's] use of the common area, work areas, and other portions of the condominium that [ ] RFS has used previously during the life of the lease as well as

interfering with [RFS]' use of the furniture and equipment . . . ."[103] Plaintiffs also allege that RFS's tenant rights were breached when the RFS lease was not renewed at the end of 2010.

103. "Under North Carolina law, absent a lease provision to the contrary, a lease carries an implied warranty that the tenant will have quiet and peaceable possession of the leased premises during the term of the lease." *K&S Enters. v. Kennedy Office Supply Co.*, 135 N.C. App. 260, 267 (1999), *aff'd per curiam*, 351 N.C. 470 (2000). An action by a landlord or its agents that deprives the tenant of its ability to use the leased premises in the manner contracted for constitutes a breach of this implied warranty. *See, e.g., Marina Food Assoc., Inc. v. Marina Restaurant, Inc.*, 100 N.C. App. 82, 92 (1990); *Andrews & Knowles Produce Co. v. Currin*, 243 N.C. 131, 135-36 (1955). If the action by the landlord or its agents renders the premises untenable and thereby causes the tenant to abandon the premises, the action amounts to constructive eviction and constitutes a breach of the implied covenant of quiet enjoyment as a matter of law. *Marina Food Assoc., Inc.*, 100 N.C. App. at 92.

104. Plaintiff Drake concedes that his dispute is not really with Prestwick, but with Woody and Yates.[104] In essence, Plaintiffs contend that Defendants Yates and Woody restricted Plaintiffs' access to certain office space and office equipment, thereby making it impossible for RFS to continue to conduct business in that space and amounting to a constructive eviction. Plaintiffs argue that Yates and Woody, as the majority ownership in POM, the 50% owner of Prestwick, were acting as agents of Prestwick in implementing these restrictions.[105] Plaintiffs also appear to argue that Prestwick's failure to renew the RFS lease breached their rights as tenants. In support of these assertions, Plaintiffs cite to deposition testimony indicating that Yates and Woody discussed amending the POM Operating

---

[103] Am. Compl. ¶ 93.
[104] Pls.' Br. Opp. Prestwick Six Mot. Summ. J. 7.
[105] Pls.' Br. Opp. Prestwick Mot. Summ. J. 2-4, 7.

Agreement such that the POM shares in Prestwick could be cast against renewing the RFS Lease.[106]

105. In light of the allegations at issue, the success of Plaintiffs' Claim against Prestwick hinges on (1) Yates' and Woody's actions being attributable to Prestwick, and (2) these actions violating a duty that Prestwick owed to Plaintiffs in the landlord/tenant relationship. The Court finds both the allegations and the underlying evidence insufficient to survive Prestwick's Motion for Summary Judgment.

106. As an initial matter, Plaintiffs have not presented this Court with a basis from which to conclude that Yates and Woody's actions may be attributed to Prestwick. There is no evidence before the Court that Yates and Woody, or POM, are managers of Prestwick. In fact, it is undisputed in the record before the Court that Earl Chesson is the manager of Prestwick.[107] Plaintiffs have presented the Court with no evidence of a direct agency relationship between Prestwick and Yates and Woody, only speculative conclusions based upon Yates' and Woody's membership in POM and evidence that Yates and Woody amended the POM Operating Agreement to, in part, enable POM to vote in favor of Prestwick's decision not to renew RFS' lease.

107. Furthermore, the record does not support Plaintiffs' contention that Yates and Woody interfered with or breached a duty that Prestwick owed to RFS under the terms of the lease. Prestwick's lease with RFS explicitly provided that automatic renewal would not occur if either party gave written notice of termination at least sixty days prior to the end of the term. North Carolina courts have previously made clear that a tenant does not have an unconditional right to expect renewal of a lease absent specific provisions to that effect. *See, e.g., Lattimore v. Fisher's Food Shoppe, Inc.*, 313 N.C. 467, 472 (1985) (finding that "clauses

---

[106] Hill Dep. at 104-05; Dep. of Carolyn S. Wagoner 96-101.
[107] Chesson Dec. ¶ 2.

providing for automatic renewals do not express the intent of the parties so clearly and unequivocally as to create a right to perpetual renewals of a lease").

108. The record also does not support Plaintiffs' contention that actions other than the non-renewal of the lease amounted to a breach of RFS' rights as a tenant. During his deposition, Drake pointed to three main issues relating to the leased space: (1) restricted access to office equipment, such as a photocopier; (2) changes to the procedure for reserving the shared conference room; and (3) interpersonal conflict with others using the leased space.[108] Though Drake conceded that these conflicts were primarily between RFS and EBS, he contended that Prestwick, as landlord, had the responsibility to protect Plaintiff's "peaceful enjoyment of the office space."[109]

109. These allegations and the record evidence before the Court are similar to those of *Charlotte Eastland Mall, LLC v. Sole Survivor, Inc.*, 166 N.C. App. 659 (2004). In *Charlotte Eastland Mall*, a retail tenant of a shopping center alleged that the covenant of quiet enjoyment had been breached by the landlord shopping center, because the shopping center failed to provide adequate security to protect the tenant store from the effects of known criminal activity. The Court of Appeals upheld the trial court's finding that a breach had not occurred, because the landlord owed no duty to protect a commercial tenant from the criminal acts of third parties. Similarly, here, it was not Prestwick's responsibility to guarantee RFS access to office equipment leased through a third-party vendor, or to ensure that RFS and EBS "played nicely" as co-tenants.

110. Finally, Plaintiffs' contention that the premises became untenable as a result of Yates' and Woody's actions is severely diminished, if not defeated, by RFS' desire to remain in the leased space. Our courts have previously found that a tenant's decision to stay in leased

---

[108] Drake Dep. at 262-63.
[109] Drake Dep. at 266-67; Drake Aff. ¶ 70.

space, even after the conditions rendering the property "untenable" have arisen, amount to a concession that a constructive eviction did not take place. *See, e.g.*, *K&S Enters. v. Kennedy Office Supply Co.*, 135 N.C. App. 260, 266-67 (1999) ("A tenant seeking to show constructive eviction has the burden of showing that he abandoned the premises within a reasonable time after the landlord's wrongful act"; citing *McNamara v. Wilmington Mall Realty Corp.*, 121 N.C. App. 400 (1996)). As in *K&S Enterprises*, Plaintiffs have failed to show that they abandoned the leased property as a result of Yates' and Woody's actions. In fact, the evidence before the Court indicates that RFS intended to renew its lease at the appropriate time.

111.     The Court therefore concludes that Prestwick's Summary Judgment Motion should be GRANTED in Prestwick's favor as to the Fifteenth Claim for Relief.

<u>Conversion</u>

112.     In the Sixteenth Claim for Relief, Plaintiffs allege that "Defendants EBS, Hill Chesson & Woody, Inc., Yates, and Woody have attempted to convert the Marks, . . . , to their own use and benefit and to exclude Plaintiff RFS from any interest or benefit therein." Plaintiffs also allege that "Defendant EBS disabled the access that Plaintiff RFS had to the SalesLogix system" and have converted to their own use SalesLogix licenses purchased by RFS.[110]

113.     Under North Carolina law, conversion is "the unauthorized assumption and exercise of the right of ownership over the goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 309 (2004). A claim for conversion applies only to goods and personal property, and does not extend to real property or "intangible interests." *See,*

---

[110] Am. Compl. ¶¶ 95-100.

*e.g.*, *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 414 (2000); *Gottfried v. Covington*, 2014 NCBC 26 ¶ 39 (N.C. Super. Ct. June 25, 2014).

114. Trademark rights are intangible property. *Black's Law Dictionary* 113 (7th Ed. 1999). It follows that the Sixteenth Claim fails insofar as Plaintiffs seek relief for conversion of their interests in the Marks.[111]

115. RFS also claims that EBS converted its rights in the SalesLogix program by denying it use of its licenses and access to the data in SalesLogix. RFS and EBS each purchased and held their own licenses to use SalesLogix.[112] RFS also paid its pro-rata portion of maintenance and support fees SalesLogix.[113] RFS used the SalesLogix program and information contained it the database.[114] In or around June, 2010, Yates, on behalf of EBS, terminated RFS' access to SalesLogix.[115] Plaintiffs' allege that "[d]espite demands by RFS, EBS never restored access . . . to the database."[116] EBS admitted it terminated RFS' access to SalesLogix, but claims that it provided RFS its data from SalesLogix on an electronic spreadsheet.[117]

116. As an initial matter, both parties made arguments regarding, and the Court must determine, whether the SalesLogix license and access to the database is "tangible" property which can properly be the subject of a cause of action for conversion. EBS contends that "electronic data and computer software are intangible property assets" and that "EBS

---

[111] The Court also notes that even if intangible property were the proper subject of a claim for conversion, in light of its conclusion that disputed issues of fact exist regarding ownership/first use of the Logo and the Slogan, summary judgment would be inappropriate on EBS' motion for summary judgment regarding those marks.

[112] Drake Aff. ¶40, Ex. 63; Woody Dep. 118; Yates Dep. 127; Colosimo Dep. 28.

[113] Drake Aff. ¶40, Exs. 64-65.

[114] Woody Dep. 117.

[115] Drake Aff. ¶49, Ex. 73; Yates Dep. 129.

[116] Drake Aff. ¶42.

[117] Yates Dep. 125-30.

cannot convert computer software."[118] Plaintiff argues, albeit without supporting precedent, that a software license and electronic information can be the subject of a conversion claim.[119]

117. Conversion applies only to goods and personal property, not "intangible interests." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390 (2000). In *Nash Johnson & Sons*, however, the Court held that a conversion claim would not cover "intangible interests *such as business opportunities and expectancy interests*," and did not consider whether electronically-stored information or the ability to access such information were the type of "goods [or] personal property" that would support such a claim. 140 N.C. App. at 414 (emphasis added). Although the Court of Appeals on at least one occasion held that "proprietary information" of the type contained in the SalesLogix database may be the subject of a claim for conversion, that decision did not make clear whether the proprietary information at issue had been reduced to a tangible form or not. *Southeastern Shelter Corp. v. Btu, Inc.*, 154 N.C. App. 321, 331 (2002) (holding that, "in the light most favorable to plaintiffs, the evidence shows defendants converted plaintiffs' proprietary information, including customer lists, contact lists, records and historical data"). On the other hand, federal district courts applying North Carolina law have divided on this question. *Compare Capitol Commission, Inc. v. Capitol Ministries*, 2013 U.S. Dist. LEXIS 142542 at *12-13. (E.D.N.C. 2013) (holding that "[a]s a matter of law, electronic data and computer software is intangible property," so the claim for conversion of "password-protected donor lists and electronic copies of defendant's training manual" could not withstand motion for summary judgment); *TSC Research, LLC v. Bayer Chems. Corp.*, 552 F.Supp. 2d 534, 542-43 (M.D.N.C. 2007) (stating that allegations that the defendant acquired the plaintiff's "proprietary technical and business information," where allegations did not expressly state whether such

---

[118] EBS' Mem. Supp. Mot. Summ. J. 16.
[119] Pls.' Br. Opp. EBS Mot. Summ. J. 15-16.

information was in tangible or intangible form, failed to state a claim for conversion) *with*

*Bridgetree, Inc. v. Red F. Mktg., LLC.*, 2013 U.S. Dist. LEXIS 15372 at \*47-51. (W.D.N.C. 2013) (holding that "a copy of [ ] computer files" were "tangible property albeit in electronic form" and that evidence that the defendants took the plaintiff's "electronic copies of . . . digitally-stored proprietary information and confidential documents" supported claim for conversion).

118. Ultimately, the Court does not see a basis to conclude as a matter of law that depriving Drake of the customer and sales information by cutting off his access to SalesLogix could not provide a basis for a conversion claim, when taking the same information printed into hard copy form would be sufficient. As the court noted in *Bridgetree*, electronic storage of information in computer readable form "is generally accepted as the preferred storage method for large amounts of data and proprietary information in this modern age." 2013 U.S. Dist. LEXIS 15372 at \*49. The Court also does not believe that the fundamentally "intangible interests" discussed in *Nash Johnson*, business opportunities and expectancy interests, are the same type of property as customer information, which case law demonstrates is readily converted to tangible form.

119. The evidence currently before the Court is that EBS terminated RFS' right to use or access the SalesLogix database. Conversion includes the "exercise of the right of ownership over the goods or personal chattels belonging to another, *to the . . . the exclusion of an owner's rights.*" *White*, 166 N.C. App. at 309; *Lake Mary Ltd. Part. v. Johnston*, 145 N.C. App. 525, 531-32 (2001) ("The essence of conversion is not the acquisition of property by the wrongdoer, but the *wrongful deprivation* of it to the owner." (emphasis added) (citation omitted)). The Court concludes that the evidence is sufficient to create a genuine issue of fact as to whether EBS wrongfully deprived RFS of the use of its licenses and access to SalesLogix.

120. Accordingly, as to the Sixteenth Claim for Relief, the EBS and Yates and Woody motions for summary judgment are GRANTED in Defendants' favor as to Plaintiffs' claim that EBS converted the Marks, but are DENIED as to Plaintiffs' claim that EBS and Yates and Woody converted RFS' rights to access SalesLogix.

<u>Seventeenth Claim for Relief</u>

121. Finally, Plaintiffs' Seventeenth Claim for Relief alleges that Woody and Yates interfered with Plaintiffs' business relationships and prospective business relationships by, *inter alia*, disabling or interfering with Plaintiffs' e-mail system and website, and providing "incorrect and misleading information to clients and prospective clients of Plaintiffs relating to the dissolution of the relationship between" RFS and EBS.[120]

122. To establish a claim for tortious interference with contract, a plaintiff must prove: (1) that a valid contract existed between the plaintiff and a third party; (2) that the defendant knew about the contract; (3) that defendant intentionally induced the third party to breach the contract; (4) without justification; and (5) resulting in injury to the plaintiff. *Bloch v. Paul Revere Life Ins. Co.*, 143 N.C. App. 228, 239 (2001). Similarly, a claim for interference with prospective economic advantage requires the plaintiff to show: (1) that the defendant engaged in purposeful conduct towards a third party; (2) without justification; (3) that induced the third party not to enter into a contract with a plaintiff; and (4) that a contract would have been formed but for the defendant's conduct. *Daimlerchrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 585 (2002); *KRG New Hill Place v. Springs Investors*, 2015 NCBC 19 ¶ 26 (N.C. Super. Ct. Feb. 27, 2015) (finding that the "inducement required to establish a claim for intentional interference with prospective economic advantage requires

---

[120] Am. Compl. ¶ 101.

purposeful conduct intended to influence a third party not to enter into a contract with the claimaint").

123.    It is undisputed in the record before the Court that Plaintiffs have not identified any specific customer or potential customer with whom Defendants' actions allegedly interfered, much less any "purposeful conduct" towards these unidentified third parties. When questioned under oath at his deposition regarding these claims, Drake admitted that he could not identify any client who had ceased doing business with Plaintiffs, or a potential client with whom a contract had not been formed, due to Defendants' actions.[121] Similarly, at the hearing on the Summary Judgment Motions, Plaintiffs could not identify any broken contracts or potential contracts.

124.    Accordingly, the Court concludes that EBS's motion and Yates' & Woody's motion should be GRANTED in Defendants' favor as to Plaintiffs' Seventeenth Claim for Relief.

CONCLUSION

In light of the foregoing, it hereby is ORDERED that:

125.    EBS' Motion for Summary Judgment is GRANTED in part and DENIED in part, as follows:

a.  The Motion is GRANTED as to Plaintiffs' First and Fourteenth Claims for Relief.

b.  The Motion is GRANTED, in part, as to Plaintiffs' Second Claim for Relief, insofar as that Claim arises out of the name "Hill, Chesson and Woody." Except as granted herein, the Motion is DENIED as to Plaintiffs' Second Claim for Relief.

---

[121] Drake Dep. 226-227.

c. The Motion is GRANTED in PLAINTIFFS' favor as to the Third, Fourth, Sixth, Seventh, Ninth, and Tenth Claims for Relief, to the extent that those Claims seek cancellation of the North Carolina trademark registrations. Registration Numbers T-20223, T-20247, and T-20312 should hereby be CANCELED from the North Carolina Trademarks Registry, pursuant to G.S. § 80-8.

d. The Motion is DENIED as to the Fifth, Eighth, and Eleventh Claims for Relief.

e. The Motion is GRANTED, in part, as to the Sixteenth Claim for Relief. The Motion is GRANTED to the extent that the Sixteenth Claim for Relief brings a claim for conversion of trademarks or trademark rights. Except as granted herein, the Motion is DENIED as to the Sixteenth Claim for Relief.

f. The Motion is GRANTED as to the Seventeenth Claim for Relief.

g. The Motion is DENIED as to Plaintiffs' affirmative defense of naked licensing.

h. The Motion is GRANTED, in part, as to EBS' Counterclaims.

   i. The Motion is GRANTED in PLAINTIFFS' favor as to EBS' Second Claim for Relief.

   ii. The Motion is GRANTED as to EBS' Third and Fourth Claims for Relief, to the extent that those Counterclaims apply to the name "Hill, Chesson and Woody." The Preliminary Injunction entered by the Honorable Shannon Joseph on November 10, 2010, hereby is CONVERTED to a permanent injunction as to the name "Hill, Chesson and Woody."

   iii. Except as granted herein the Motion is DENIED as to the Counterclaims.

126. Yates' and Woody's Motion for Summary Judgment is GRANTED, in part, as follows:

a. The Motion is GRANTED as to the Twelfth and Thirteenth Claims for Relief.

b. The Motion is GRANTED in PLAINTIFFS' favor as to the Third, Sixth, and Ninth Claims for Relief, to the extent that those Claims seek cancellation of the North Carolina trademark registrations. As discussed above, registration Numbers T-020223, T-020247, and T-020312 should hereby be CANCELED from the North Carolina Trademarks Registry, pursuant to G.S. § 80-8.

c. The Motion is GRANTED, in part, as to the Sixteenth Claim for Relief. The Motion is GRANTED to the extent that the Sixteenth Claim for Relief brings a claim for conversion of trademarks or trademark rights. Except as granted herein, the Motion is DENIED as to the Sixteenth Claim for Relief.

d. The Motion is GRANTED as to the Seventeenth Claim for Relief.

127. The HCWI Motion for Summary Judgment is GRANTED, in part, as follows:

a. The Motion is GRANTED, in part, as to Plaintiffs' Second Claim for Relief, insofar as that Claim arises out of the name "Hill, Chesson, and Woody." Except as granted herein, the Motion is DENIED as to Plaintiffs' Second Claim for Relief.

b. The Motion is GRANTED, in part, as to the Sixteenth Claim for Relief. The Motion is GRANTED to the extent that the Sixteenth Claim for Relief brings a claim for conversion of trademarks or trademark rights. Except as granted herein, the Motion is DENIED as to the Sixteenth Claim for Relief.

c. Except as granted herein, the Motion is DENIED.

128. The Prestwick Six Motion is GRANTED.

129. Plaintiffs' Motion is GRANTED, in part, as follows.

a. The Motion is GRANTED as to EBS' Second Counterclaim.

b. The Motion is DENIED as to EBS' First Counterclaim.

130.    Except as granted herein, the Motions are DENIED.

This the 14th day of July, 2015.


                                        /s/ Gregory P. McGuire
                                        Gregory P. McGuire
                                        Special Superior Court Judge
                                          for Complex Business Case